**DON'T TEAR IT DOWN, INC., et al., Petitioners,**

**v.**

**D. C. DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT, Respondent,**

Potomac Electric Power Company, Intervenor.

No. 80–883.

District of Columbia Court of Appeals.

Argued Jan. 29, 1981.

Decided March 6, 1981.

---

S. Mark Tuller, Washington, D. C., for petitioners.

Richard B. Nettler, Asst. Corp. Counsel, Washington, D. C., with whom Judith W. Rogers, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington D.

C., were on the memorandum in lieu of a brief, for respondent. David P. Sutton, Asst. Corp. Counsel, Washington, D. C., also entered an appearance for respondent.

Whayne S. Quin, Washington, D. C., with whom Carolyn J. Hamm, Washington, D. C., was on the brief, for intervenor.

Before MACK, FERREN and PRYOR, Associate Judges.

PRYOR, Associate Judge:

Petitioners, Don't Tear It Down, Inc., and Georgetown Citizen's Association[1] seek review of an order of the Mayor's agent for the District of Columbia Historic Landmark and Historic District Protection Act of 1978, D.C. Code 1980 Supp., §§ 5–821–835, authorizing the issuance of a demolition permit sought by PEPCO ("the applicant") to demolish buildings located on PEPCO's Georgetown property.

Petitioners advance several arguments for reversal. Among them, petitioners challenge the sufficiency of the findings of fact and conclusions of law, as well as the agent's construction and application of the Historic Landmark and Historic District

Protection Act of 1978, D.C. Code 1980 Supp., §§ 5–821–835.

Intervenor raises one jurisdictional challenge which it raised at hearing, namely, that the petition was not properly before the Joint Committee on Landmarks for review.

For the reasons stated below, we reverse and remand in part, and affirm in part.

FACTUAL BACKGROUND

This dispute concerns the proposed demolition of two nineteenth century buildings owned by PEPCO—The Conduit Shop, built in 1888, and the North building, built in 1899. Both buildings are a part of PEPCO's Georgetown Substation facility located at 33rd and K Streets, N.W., in the Georgetown Historic District. The North Building, designed for power production, is now used to house part of the substation facility. The Conduit Shop was originally used as an architectural iron works and later a repair shop, but has not been in use since 1979.

PEPCO desires to replace the present Georgetown Substation facility, which has reached the end of its useful service life, with a new more safe and efficient substation. To that end, PEPCO planned to de-

---

1. Advisory Neighborhood Commission 3A, and its chairman, Raymond Kukulski, also sought judicial review of the order. As a preliminary matter, this court must decide whether all of the parties seeking judicial review of the order have standing to do so. D.C. Code 1978 Supp., § 1–171i(g), as clarified by Kopff v. District of Columbia, Alcoholic Beverage Control Board, D.C.App., 381 A.2d 1372 (1978), makes clear that the ANC is precluded from seeking judicial review of an administrative proceeding. Petitioners conceded this point in their pre-review memoranda. However, petitioners made a motion to substitute Raymond J. Kukulski, chairman of ANC 3A, as a party in place of ANC 3A. By order of this court, October 17, 1980, this motion was deferred for decision by this panel. Having reviewed the controlling rule and pertinent case law, we are satisfied that the motion should be denied.

D.C.App.R. 43(b) read in conjunction with 43(a) indicates that substitution of one party for another will be allowed where someone with standing as a party in a legal action dies or becomes otherwise incompetent. The rule presupposes that substitution is for someone who was a party to a pending action. Substitution is allowed where "necessary" to preserve

and protect the legal rights of the party who become incompetent. In the case sub judice, substitution is inappropriate for at least two reasons.

First, it is clear from Kopff, supra, and Wheeler v. District of Columbia Board of Zoning Adjustment, D.C.App., 395 A.2d 85, 87 n.1 (1978), that the Commissioner as an individual citizen had standing to initiate this action. He failed to do so. At this juncture of the proceeding, the Commissioner can only become a substitute party for the ANC if the ANC was, in fact, a party in this litigation. Since the ANC could not be a party in this judicial action, Kopff, supra, and Wheeler, supra, 395 A.2d at 87 n.1, substitution is improper.

Secondly, Rule 43(b) makes "necessary" the standard for allowing substitution. In this action since two of the original Parties in Opposition are petitioners on appeal and the Commissioner does not wish to file an additional brief and does not assert that the petitioners before this court cannot adequately represent the interests of the ANC, substitution is not necessary.

For the above reasons, petitioners' motion to substitute Commissioner Kukulski in his individual capacity as a party petitioner, is denied.

molish the North Building and the Conduit Shop,[2] build a new substation on the southeast quadrant of the lot, on the site of the Conduit Shop, and a pedestrian path across the area where the North building is located.

PEPCO requested a permit to demolish the buildings. Because of its location in the Georgetown Historic District, PEPCO's application was governed by the requirements of the Historic Landmark and Historic District Protection Act of 1978, D.C. Code 1980 Supp., § 5–824, and the Old Georgetown Act, D.C. Code 1973, § 5–802, which respectively provide in pertinent part:

D.C. Code 1980 Supp., § 5–824. Demolitions.

(a) Before the Mayor may issue a permit to demolish an historic landmark or a building or structure in an historic district, the Mayor shall review the permit application in accordance with this section and place notice of the application in the District of Columbia Register.

(b) Prior to making the finding required by subsection (e) of this section, the Mayor may refer the application to the Historic Preservation Review Board for a recommendation, but shall so refer all applications that are not subject to review by the Commission of Fine Arts under the Old Georgetown Act (D.C. Code § 5–801 et seq.) The Mayor shall consider any recommendation by the Review Board or by the Commission of Fine Arts pursuant to such referral.

(c) Within one hundred and twenty (120) days after the Review Board receives the referral, the Mayor shall after a public hearing, make the finding required by subsection (e) of this section: Provided, that the Mayor may make such finding without a public hearing in the case of a building or structure in an historic district or on the site of an historic landmark if the Review Board has advised in its recommendation that the building or structure does not contribute to the historic district or the historic landmark.

(d) If the Review Board recommends against granting the permit, it shall promptly notify the applicant in writing of its recommendation and the reasons therefore.

(e) No permit shall be issued unless the Mayor finds that issuance of the permit is necessary in the public interest, or that failure to issue a permit will result in unreasonable economic hardship to the owner.

(f) The owner shall submit at the hearing such information as is relevant and necessary to support his application.

D.C. Code 1973, § 5–802. Restrictions imposed on alteration of buildings.

In order to promote the general welfare and to preserve and protect the places and areas of historic interest, exterior architectural features and examples of the type of architecture used in the National Capital in its initial years, the Commissioner of the District of Columbia, before issuing any permit for the construction, alteration, reconstruction, or razing of any building within said Georgetown district described in section 5–801 shall refer the plans to the National Commission of Fine Arts for a report as to the exterior architectural features, height, appearance, color and texture of the materials of exterior construction which is subject to public view from a public highway. The National Commission of Fine Arts shall report promptly to said Commissioner of the District of Columbia its recommendations, including such changes, if any, as in the judgment of the Commission are necessary and desirable to preserve the historic value of said Georgetown district. The said Commissioner shall take such actions as in his judgment are right and proper in the circumstances. Provided, That, if the said Commission of Fine Arts fails to submit a report on such plans within for-

---

2. The plan is to demolish the structures but preserve the two major facades of the Conduit Building at 33rd and K Streets, N.W.

ty-five days, its approval thereof shall be assumed and a permit may be issued.

Pursuant to the above Acts, PEPCO's application was referred to the Commission of Fine Arts (CFA) for review. By letter dated March 20, 1980, the CFA made the following recommendation:

Issue permit for demolition on site as proposed: note that south and east walls of existing conduit building at corner of 33rd and K Streets, N.W., will be stabilized, retained and restored as a part of the new construction on the site. Submit designs for new construction as ready with understanding that conceptual exterior design sketches have been viewed and considered out of character with historic district.

PEPCO's application was also submitted for review to the Joint Committee on Landmarks of the National Capital (JCL), which serves as the Historic Preservation Review Board. See D.C. Code 1980 Supp., § 5–823(a). On April 17, 1980, the JCL recommended that the demolition permit not be granted:

... because the building contributes to the character of the Georgetown Historic District and therefore its demolition would be inconsistent with the purposes of the Act as set forth in Section 2(b).

As a result of the JCL recommendation to deny the permit, PEPCO was subsequently granted a public hearing before the Mayor's agent, pursuant to the Act. The petitioners filed pleadings and appeared as Parties in Opposition.

### THE ACT

The Historic Landmark and Historic District Protection Act of 1978, D.C. Code 1980 Supp., §§ 5–821–835 (hereinafter the Act), was enacted in an attempt to provide protection to the historic landmarks in the District of Columbia. See D.C. Code 1980 Supp., § 5–821. Generally, the Act prohibits the issuance of a demolition permit for buildings within a historic district. There are, however, three circumstances when a demolition permit for such buildings may be issued. A permit may issue where the Mayor's agent finds:

(i) a building located in a historic district does not contribute to the character of the district; or

(ii) demolition is necessary to allow the construction of a project of special merit, or

(iii) failure to issue the demolition permit will result in a taking of the owner's property without just compensation.

PEPCO proceeded on all three theories at the hearing, and evidence was introduced on each point. However, the Mayor's agent did not reach the issues of "contribution to the character of the historic district," or "unreasonable economic hardship" because she found that the project was "necessary" to allow the construction of a project of special merit. As the Mayor's agent limited her findings and conclusions to the issue of necessity, we limit our review of the evidence to the evidence of record on this point.

### THE HEARING

A four day public hearing was conducted during the course of which seventeen witnesses testified in support of or against demolition, and fifty-four exhibits were admitted into evidence. All parties agreed that a replacement facility was needed and that the substation facility is a project of special merit.[3] The parties took strongly different positions to whether demolition was necessary to allow construction of the project of special merit.

### APPLICANTS' EVIDENCE

On the issue of the necessity of demolishing the present structures, applicant's evidence established that before deciding to demolish the present structure and build a replacement facility, applicant conducted an

---

3. Section 3(k) of the Act provides the following definitions of "special merit":

(k) "special merit" means a plan or building having significant benefits to the District of Columbia or to the community by virtue of exemplary architecture, specific features of land planning or social or other benefits having a high priority for community services.

engineering study.[4] The following alternatives emerged as the result of the study:

(1) *DO NOTHING*—This option was rejected as being inconsistent with PEPCO's obligation as a public utility to provide reliable electric service to all of its customers, and safe equipment for its operating personnel. Further, load commitments could not be met by letting the substation continue to age and deteriorate.

(2) *TRANSFER LOAD TO ADJACENT SUBSTATIONS*—This option was rejected for several reasons. First, it would entail a great deal of disruption in the Georgetown area for street openings, cable relocations, and moving lines. Secondly, moving the Georgetown load to another facility (19th and I Streets) would overduty the transfer facility and eventually PEPCO would have to again relocate the Georgetown load. Transferring the load would involve a substantial cost;

(3) *REPLACE EQUIPMENT WITHIN EXISTING FACILITY*—PEPCO rejected this option for two primary reasons; (1) replacing equipment within the existing facility would entail an almost continuous building program at the Georgetown substation for ten years. Such a program would create an unwieldly risk to the reliability of service and a hazard to operating and construction personnel; (2) PEPCO could not completely turn off the existing substation when the transfer was taking place. It would have to shut down one-third of the substation at all times while the transfer was being made. This would further overduty the equipment which remained in use and tax it beyond its limit at peak load conditions, further jeopardizing service. The end result would be a substation which was still deficient according to modern standards;

(4) *BUILD A NEW FACILITY IN THE GEORGETOWN AREA ON A NEW SITE*—This option was attractive to

4. Applicant studied eight plans before narrowing its options to five alternatives:

*Alternative A*—Expand the 1950 building to accommodate new 13kV switchgear, and to provide for a future fourth 13kV transformer. Enclose all existing outdoor facilities with a new building. Subsequent removal of existing 13kV switchgear will provide sufficient area for future relocation of 4kV switchgear. Conduit facilities will be abandoned and that portion of the property sold.

*Alternative B*—Expand the 1950 building to accommodate new 13kV and 4kV switchgear and provide for a future fourth 13kV transformer. Enclose all existing outdoor facilities with a new building. Replace 4kV transformers and remove regulators. Conduit facilities and the 1898 building will be abandoned and that portion of the property sold.

*Alternative C*—PEPCO to finance and construct a new 13kV and 4kV substation on a portion of the present conduit yard site. Conduit facilities and the 1898 building will be abandoned and that portion of the property sold.

*Alternative D*—Sale/Leaseback. Sell the entire site and abandon conduit facilities. Continue to utilize this existing substation until the new 13kV and 4kV substation is constructed by a private developer on a portion of the present conduit yard site. The

lease on the new facilities will commence upon completion of the electrical installation.

*Alternative E*—Was not discussed at the proceeding because it was alleged to be a totally internal matter. It was, however, similar to alternatives C and D, with the exception of the financing.

*Alternative F*—(Similar to Alternative B.) Expand the 1950 building to accommodate new 13kV switchgear and provide for a future fourth 13kV transformer. Convert all 4kV lines and cables in Georgetown to 13kV. Abandon conduit facilities and 1898 building and sell that portion of the property.

*Alternative G*—(Similar to Alternative C.) Abandon the conduit facilities and build a new 13kV substation on a portion of the present conduit yard site. Retire all other existing facilities and sell the balance of the site. Convert all 4kV lines and cables in Georgetown to 13kV. Review the possibility of selling the air rights above the new 13kV substation.

*Alternative H*—(Similar to Alternative D.) Sale/Leaseback. Sell entire site and abandon conduit facilities. Convert all 4kV lines and cables in Georgetown to 13kV. Continue to utilize existing substation until a new 13kV substation is constructed by a private developer on the conduit yard site and the 4kV to 13kV conversion is complete.

PEPCO. It would enable the existing substation to remain in service until the new substation was completed. At that time, the electric load could be transferred to the new substation. The existing substation would be phased out of service at that time. The site of the existing substation would be declared nonutility property and sold.

Despite the initial attractiveness of this alternative, it was ultimately rejected because no alternative sites were readily available in the Georgetown area nor were any such sites more suitable or centrally located for a substation than the existing site. Further, any new site would be more expensive than the existing facility, and relocating the feeders and cables cause disruption of traffic;

(5) *A NEW FACILITY ON THE PRESENT SITE*—This option is the one ultimately selected by PEPCO. It would entail constructing an entirely new facility on the site of the vacant Conduit Shop and yard. The new facility could be constructed without disrupting the operation of the existing substation, or disrupting traffic on the Georgetown streets. The new facility would be an enclosed building providing security for the public and decreasing noise. It would have new equipment expected to last until the turn of the century. When completed, the land outside of the facility would be declared nonutility and sold.

This option would provide the most reliable and safe electric service to PEPCO's customers at a reasonable cost. The reliability of the plant, plus the reasonableness of the cost lead PEPCO to select this option.

Applicant introduced evidence to show that adaptive reuse of the buildings is not feasible because of zoning, cost, and structural problems.

Thought was given to using the Conduit Shop as part of the substation, but that too was rejected because experts found the building to be inadequate to serve a first-class substation.

PEPCO ruled out housing parts of the substation in separate buildings or in separate areas of the site (and retaining the North Building and Conduit Shop) primarily because doing so is inconsistent with PEPCO substation designs. PEPCO consolidates its equipment within one structure to increase efficiency of the layout and cut down on the amount of circuiting and cable, therefore, reducing the possibility of failures and breakdowns.

Having explored the above options, PEPCO decided that demolition of the North Building and Conduit Shop is necessary in the public interest.

THE OFFICE OF PLANNING AND DEVELOPMENT

An electrical engineer testified on behalf of the Office of Planning and Development. He stated that he visited the Georgetown site and made a cursory inspection of the outdoor substation equipment. He concluded that the North Building and Conduit Shop were unfit for utility use, and that there was an acute need for replacement of the substation. He reviewed the PEPCO proposal and found it satisfactory; however, he proposed an alternative action which could salvage the historic buildings. The proposal would entail looping the cables beneath the Conduit Shop. New construction would be necessary, and additional rerouting costs would be incurred.

The proposal was not in final form and required more study and translation into design specifics. A feasibility study had not been done. PEPCO thus rejected this proposal because of the additional time necessary to complete it, and then determine its feasibility. It was also clear that the project would be more costly than the PEPCO plan, and PEPCO sought to provide the most efficient service at the lowest cost possible, consistent with its mandate as as public utility.

PARTIES IN OPPOSITION

An expert in design of electrical substations testified on behalf of the petitioners, on the issue of "necessity." The expert studied PEPCO's preliminary plans, layout of the equipment; single-line drawings, and current architectural drawings, as well as the site itself, and concluded that a building, meeting all of the requirements of the PEPCO substation, could be built farther west of the existing site without demolishing the Conduit Shop. (This plan would necessitate demolishing a small house on the site of the Conduit Shop). The petitioners' expert prepared a concept drawing of the substation he proposed. It would be basically identical to the one proposed by PEPCO, but would be housed in a new building built on open space thereby preserving the historical buildings.

Though conceptualized, this alternative was not developed. The witness was not certain how long it would take to convert the concept into a final design, but proffered that he thought it could be accomplished in two or three months. The plan had not been presented to a structural engineer, or an architect, or PEPCO. Cost was not considered, nor was consideration given to whether this plan would comply with the District of Columbia Building Code. Physical arrangement was the sole consideration which lead to this alternative.

Because of the foregoing, and the fact that the witness testified that, at a minimum, the project would cost 10 to 15 percent more than the PEPCO plan, this plan was likewise rejected.

FINDINGS AND CONCLUSIONS

On the above evidence of "necessity in the public interest," the Mayor's agent found that

after detailed examination of possible alternatives over several years, beginning before passage of the Act, the applicant has demonstrated that in this particular case the PEPCO proposal is the only available alternative. PEPCO's analysis demonstrated that their proposal is more than a convenient, feasible or economically advantageous plan. Although alterna-

tive conceptual proposals were presented, it is unproven that the obstacles ... could be overcome and the alternative proposals seriously considered and executed.

The agent thus concluded:

... The demolition requested is necessary to construct a project of special merit. The applicant is a regulated public utility company established to provide adequate and reasonably safe electrical service to the District of Columbia and vicinity. As the record shows, it is agreed by all concerned parties that the project proposed is one of special merit: the ability to provide electrical service is a "high priority for community service."

The demolition requested is necessary in order to continue to provide safe, reliable, efficient electrical service in a timely manner and not to cause any disruption in service to the Georgetown community. The record shows that failure to go forward with the project as proposed will seriously jeopardize PEPCO's ability to provide such service.

CHALLENGES ON APPEAL

I

The first challenge on appeal is jurisdictional in nature. PEPCO asserts here as it did below that review of its application by the JCL was unlawful. PEPCO urges that the Act required referral only to the CFA in this instance and that since the CFA determined that the subject structures do not contribute to the historic district, the demolition permit should have been granted.

The legislative history of the Act reveals clearly that the jurisdictional question raised by the applicant was pondered and resolved by the legislators prior to passing the Act in its present form.

The CFA is a federal agency created by an Act of Congress, "The Old Georgetown Act", D.C. Code 1973, § 5–801 *et seq.* Under that Act, the CFA was vested with authority to review plans of anyone re-

---

questing, *inter alia*, a demolition permit in the Georgetown Historic District, and to report to the Commissioner of the District, its recommendations. The Commissioner, once having reviewed the report, is to take whatever actions he or she deems proper under the circumstances.

The District of Columbia Historic Preservation Act gives the mayor discretion to refer the same applications to the Historic Preservation Review Board. Prior to approval of the Act, the CFA challenged this provision providing duplicative review. The Ad Hoc Committee for the Act,[5] fully investigated the question and received a legal opinion from the then Acting Corporation Counsel for the District of Columbia:

> Although, as a general principle, an Act of Congress may preempt a state law, it is clear that states may enact legislation which does not conflict with Federal law. *Kargman v. Sullivan*, 552 F.2d 2 (1st Cir. 1977). Federal and local laws may coexist in the same area, and the local law may exact additional requirements which are not inconsistent with the Federal law. *Maryland & District of Columbia Rifle and Pistol Association, Inc. v. Washington*, 442 F.2d 123, at 130 (D.C. Cir. 1971).

Under the Old Georgetown Act, the Commission of Fine Arts reports to the Mayor of the District of Columbia on all permit applications with respect "to the exterior architectural features, height, appearance, color and texture of the materials of exterior construction which is subject to public view from a public highway." The Mayor is then required "to take such actions as in his judgment are right and proper under the circumstances." 64 Stat. § 2–903, D.C. Code § 5–802. Under Bill 2–367, the Mayor may also refer permit applications in Georgetown to the Historic Preservation and Review Board.

It is clear from the statutory language that the function of the Commission of Fine Arts pursuant to the Old Georgetown Act is solely advisory. Final au-

thority for issuing permits rests with the Mayor. The Mayor is under no obligation to follow the Commission's recommendation, nor is he prevented from receiving additional advice. In addition, the purpose of the proposed local legislation is consistent with the Federal purposes, the preservation of the Georgetown Historic District. Therefore, the proposed legislation does not conflict with the statutory scheme of the Old Georgetown Act. [Letter from Louis P. Robbins, Acting Corporation Counsel, D. C., to Honorable Nadine P. Winter, D. C. City Councilwoman, undated—incorporated into the Legislative History of the Act as Exhibit C].

On advice of counsel, and after full discussion, the Committee overwhelmingly voted to approve the Act with the review provision.

■ We are satisfied that the Act does provide for discretionary duplicative review and that so doing poses no constitutional problem. We find that the referral to the JCL in this instance was a proper action.

II

A second challenge pertains to the ruling of the agent regarding the North Building. Petitioners assert that even under PEPCO's substation plan, demolition of the North Building is not necessary because it is located on the northeast quadrant of the lot. The PEPCO plan contemplates construction of the new substation solely on the southeast quadrant, where the Conduit Shop is located. Thus, petitioners assert that it was error for the Mayor's agent to fail to distinguish between the two buildings, and that the agent's finding of "necessity" with regard to demolition of the North Building cannot stand.

Respondent agrees with petitioners that demolition of the North Building is not necessary for construction of the project of special merit, and that it was error for the Mayor's agent to so find. Respondent posits that the error was made because the

---

**5.** The Secretary of CFA was a member of the Ad Hoc Committee.

argument advanced at the hearing seemed to be with regard to both buildings, and that it was not until petitioners changed the focus of this argument in this court, to assert that demolition of the North Building was an issue separate from demolition of the Conduit Shop, that the Mayor's agent reviewed the record and discovered that petitioners also raised this issue.

The Mayor's agent submits that the grounds upon which she relied in granting the application for the demolition permit do not support demolition of the North Building. She urges us to remand on this point, so that further findings and conclusions can be made concerning whether a demolition permit for the North Building should be granted, either because it does not contribute to the historic district or because denial of the permit would result in unreasonable economic hardship to the applicant. Both of these issues were raised by PEPCO below, but no finding was made in this regard because the agent concluded that PEPCO was entitled to the permit in order to construct a project of special merit—namely, a substation which would provide "safe, reliable, efficient electrical service" in a timely manner.

▇ We do not make a ruling on this issue, however, but rather remand on this point and urge the Mayor's agent to make a finding as to whether the question of the North Building was in fact before her; and if so, to make specific findings as to whether the demolition permit should be granted for the North Building because it does not contribute to the historic district or because denial of the permit will result in unreasonable economic hardship to the applicant.

### III

▇ Petitioners additionally challenge the sufficiency of the findings of the May-or's agent on the basis that she merely selected portions of the testimony and restated the same, without explaining why some testimony is credited and relied upon, while conflicting and contradictory testimony is rejected. Implicit in this challenge is that the agent, in fact, had a legal duty to explain why certain testimony was credited. This is not so. This court has stated that an agent is not required to explain why it favored one witness' testimony over another, or one statistic over another. *Citizens Association of Georgetown v. District of Columbia Zoning Commission*, D.C.App., 402 A.2d 36, 47 (1979).[6] The agent may not, however, merely restate the testimony of the witnesses. *Newsweek Magazine v. District of Columbia Commission on Human Rights*, D.C.App., 376 A.2d 777, 784 (1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978). The agent is required to make written findings of basic fact on each materially contested issue; these findings taken as a whole, must rationally lead to the conclusions reached by the agent; and each finding must be supported by evidence sufficient to convince reasonable minds of its adequacy. *Citizens Association of Georgetown, supra* 402 A.2d at 42; *Newsweek, supra* at 376 A.2d 784; *Dietrich v. District of Columbia Board of Zoning Adjustment*, D.C.App., 293 A.2d 470, 472–73 (1972).

We reviewed the findings of the Mayor's agent with the above precepts as our guide, and did not find, as petitioner asserts, that the findings are deficient. To the contrary, we perceive the findings to be in accord with statutory mandate and case precedent.

### THE FINDINGS

Opponents agreed with PEPCO that the substation was a special merit project within the meaning of the Act.[7] One material contested issue remained to be resolved by the Mayor's agent—whether the issuance of

---

**6.** We there noted, *id.* at 402 A.2d 36, 47 n.19, that in some cases where the evidence in support of a finding is so weak or scant in contrast with evidence to the contrary, to avoid remand, an agency "would have to give persuasive reasons for its reliance on particular testimony; otherwise the evidence could not be deemed 'reliable, probative, and substantial.'" But that is not the case here, where the applicant and opponents presented abundant evidence on the material fact of whether demolition was "necessary in the public interest."

**7.** *See* note 3, *supra.*

the permit was necessary in the public interest—that is, consistent with the purposes of the Act, or necessary to allow the construction of the project of special merit, or that the failure to issue the permit would result in unreasonable economic hardship to PEPCO. *See* D.C. Code 1980 Supp., § 5–824.

■ In Finding No. 37, the Mayor's agent made a specific finding on this issue:

The Mayor's agent finds that after detailed examination of possible alternatives over several years, beginning before the passage of the Act, the applicant has demonstrated that in this particular case the PEPCO proposal is the only available alternative. PEPCO's analysis demonstrated that their proposal is more than a convenient, feasible or economically advantageous plan.

Petitioners nonetheless challenge this finding on the basis that the hearing examiner has in no way "directly related" this assertion to the specific contested alternatives presented at the hearing.... In some thirty-six findings, the agent laid a foundation for and "directly related" this finding to the considered alternative plans. The agent painstakingly summarized the evidence adduced at the hearing and discussed in some detail the evidence upon which she based her ultimate finding on the material contested issue.

In contrast with the findings in the *Newsweek* case, *supra,* which petitioners attempt to equate to those before us, the instant findings include considerably more than necessary, much of which is indeed a reiteration of the evidence at the hearing. In *Newsweek,* however, we found that the findings were incomplete and did not resolve basic issues of fact raised by the evidence. Many of the findings in that case were also restatements of the evidence at the hearing, and we found such findings to be insufficient substitutes for specific findings on the material issues. In a case such as the one before us where we can sift the findings from the restatement of evidence and still have findings on the material contested issue(s), we will not set the findings aside.

IV

■ Petitioners additionally challenge the legal conclusions reached by the Mayor's agent on grounds that the agent erroneously imported delay into the "necessary" standard and also improperly infused other irrelevant considerations, such as cost, into the standard. Petitioners appear to be correct in their observation that the agent considered cost, delay, technical feasibility, and other factors in construing "necessary". However, we find that the agent did not err in so doing.

The applicant introduced substantial evidence at hearing, that it considered a number of reasonable alternatives to demolition prior to deciding to demolish the substation. The parties in opposition introduced evidence that an alternative to demolition existed. They did not assert that it was unreasonable for the applicant not to have considered the alternative which they deemed feasible, but rather, merely that an alternative to demolition did exist. As the petitioners did not challenge the reasonableness of the applicant's failure to have considered their proposed alternatives along with the others, additional cost, delay, and the technical feasibility of petitioners' proposed alternative, all became valid considerations in determining necessity. For the applicant is not charged with considering every option that any party in opposition might conceptualize to avoid demolition. Rather, all reasonable alternatives must be considered.

Without imposing a reasonableness limitation on alternatives which an applicant must consider prior to resorting to demolition, one can envision endless challengers submitting numerous proposed alternatives, without regard for time frames, cost, efficiency, or zoning, housing and related regulations, urging that their alternative be adopted at the ninety-ninth hour.

On the other hand, an applicant may not reject plans which it reasonably should have considered, neglect to bring such plans to readiness, and at hearing use the delay in

completing such plans as a basis for rejecting the same; nor can "necessary" be equated with "least expensive" and all viable alternatives which are more costly than the one proposed by the applicant, be summarily rejected.

Reasonableness must be imputed into the "necessary" standard, and at hearing on each "special merit" permit, factors including but not limited to cost, delay, and technical feasibility become proper considerations for determining "necessary." In this case, the public utility's charge: to provide adequate and reasonably safe service which is just, reasonable, and nondiscriminatory, D.C. Code 1973, § 43–301, also was a valid consideration. Each of these factors has bearing on whether there are viable alternatives to demolition available, and the answer to this question determines necessity.

Examining the order as a whole, we find that in some respects it is inartfully drafted, however, we find no defect warranting reversal in full.

Accordingly, we affirm respondent's order authorizing the issuance of a demolition permit for the Conduit Shop; we reverse the order as to the North Building and remand for further action.

*Affirmed in part and reversed in part.*