## CITIZENS COMMITTEE TO SAVE HISTORIC RHODES TAVERN, Petitioner,

v.

## DISTRICT OF COLUMBIA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT, Respondent.

Oliver T. Carr, Jr., and George H. Beuchert, Jr., Trustees, Intervenors.

No. 80–179.

District of Columbia Court of Appeals.

Argued Oct. 29, 1980.

Decided May 29, 1981.

---

William A. Dobrovir, Washington, D. C., with whom S. Richard Rio, Jr., Washington, D. C., was on the briefs, for petitioner.

Richard B. Nettler, Asst. Corp. Counsel, Washington, D. C., argued for respondent. Richard W. Barton, then-Deputy Corp. Counsel, Washington, D. C., also entered an appearance for respondent. (Respondent adopted the briefs of intervenors.)

Norman M. Glasgow, Washington, D. C., with whom Norman M. Glasgow, Jr., and Carolyn J. Hamm, Washington, D. C., were on the briefs, for intervenors.

Before HARRIS, MACK and FERREN, Associate Judges.

HARRIS, Associate Judge:

Petitioner seeks review of an order of the Mayor's Agent issued under the District of Columbia Historic Landmark and Historic District Protection Act of 1978, D.C.Code 1980 Supp., §§ 5–821 et seq. (the Act), authorizing a demolition permit to allow the razing or relocation of a building located at the corner of 15th and F Streets, N. W., known as Rhodes Tavern.[1] In its challenge to the order, petitioner contends that: (1) the Mayor's Agent failed to apply the appropriate statutory standard for concluding that the permit should be issued; (2) there was insufficient evidence in the record to support the finding of the Mayor's Agent that demolition is necessary to allow the construction of a project of special merit; (3) the Act is impermissibly vague; and (4) the Mayor's Agent erred in denying petitioner's motion for her disqualification. Finding no error, we affirm.

I

The chronology of events in this case is somewhat complex and the issues are pervaded by a degree of emotionalism.[2] On one side is petitioner, a group of citizens motivated by a desire to preserve historical values in the District of Columbia, which unquestionably is one of the nation's historically most significant cities. On the other side are the intervenors, motivated by their not altogether selfless desire to stimulate economic growth in a city in need of it. In between was the Mayor's Agent who, in effect, is directed by statute to resolve the conflict between preservation and development objectives. Our review of her decision is limited.

In enacting our historical preservation statute, the District of Columbia joined the 50 states and over 500 municipalities which have passed similar statutes "to encourage or require the preservation of buildings and areas with historic or aesthetic importance." *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 107, 98 S.Ct. 2646, 2650, 57 L.Ed.2d 631 (1978) (footnote omit-

---

1. The structure has been utilized for a variety of commercial uses since serving as a tavern and meeting place in the early 1800's.

2. In testimony before the Mayor's Agent on the application, Rhodes Tavern was referred to as everything from a "sorry remnant[ ]" to "a jewel." While one observer expressed the view that keeping Rhodes Tavern in the midst of the proposed new construction would create "a tooth gap in the smile of 15th Street," another suggested that its destruction "would tear a gaping hole in the rich tapestry of the city's history." One witness called Rhodes Tavern "a rather mundane, ordinary, not terribly historically important building," while another pointed out that "the most extraordinary events can begin in small places, like stables for instance." In a written submission to the Mayor's Agent, that writer also suggested that relocating Rhodes Tavern would be like "preserv[ing] Plymouth Rock ... by moving it inland."

ted). As the Supreme Court noted, these legislative efforts have been prompted by two concerns:

The first is recognition that, in recent years, large numbers of historic structures, landmarks, and areas have been destroyed without adequate consideration of either the values represented therein or the possibility of preserving the destroyed properties for use in economically productive ways. The second is a widely shared belief that structures with special historic, cultural, or architectural significance enhance the quality of life for all. Not only do these buildings and their workmanship represent the lessons of the past and embody precious features of our heritage, they serve as examples of quality for today. [*Id.*, at 108, 98 S.Ct. at 2651 (footnotes omitted).]

See also *Maher v. City of New Orleans*, 516 F.2d 1051, 1060 (5th Cir. 1975), *cert. denied*, 426 U.S. 905, 96 S.Ct. 2225, 48 L.Ed.2d 830 (1976). Likewise, our statute declares "as a matter of public policy that the protection, enhancement and perpetuation of properties of historical, cultural and aesthetic merit are in the interests of the health, prosperity and welfare of the people of the District of Columbia." D.C.Code 1980 Supp., § 5–821(a). *See Don't Tear It Down, Inc. v. Department of Housing and Community Development*, D.C.App., 428 A.2d 369 at 373 (1981). To implement this policy, the Act provides a statutory scheme whereby, once a building has been designated a historic landmark, proceedings looking to demolish or alter it in any way must be conducted by the Mayor or his designated agent[3] with the advice of the Historic Preservation Review Board.[4]

Against this backdrop, intervenors propose to construct an office and retail stores complex subsuming the downtown block bounded by 14th, 15th, F, and G Streets, N. W., excluding the area occupied by Garfinckel's department store. In designing their proposal, intervenors were faced at the outset with a substantial obstacle, namely, the presence of the site of three Category II landmark structures: the Keith's Theater and Albee Building (Keith-Albee), the National Metropolitan Bank building (the Bank), and the remains of Rhodes Tavern, a portion of which had been destroyed in 1957.[5] The structures face, directly across 15th Street, the United States Treasury Building, which is a Category I landmark.

By the fall of 1977, the Carr Company was investigating development alternatives for the site. In January 1978, intervenor Carr contracted with the architectural firm of Skidmore, Owings & Merrill to prepare a comprehensive study of the site's design potential with particular attention to determining the feasibility of preserving all three landmarks on the block. The architect assigned to the project prepared nine alternative proposals, ranging from total

---

**3.** *See* D.C.Code 1980 Supp., § 5–822(h).

**4.** Permit applications affecting landmarks in the Old Georgetown district are subject to review by the Commission of Fine Arts, *see* D.C. Code 1973, § 5–802, and may be referred to the Historic Preservation Review Board for a recommendation. All other applications, as in this case, must be referred to the Review Board before being acted upon by the Mayor's Agent. D.C.Code 1980 Supp., § 5–824. Until such time as the Mayor establishes a local Review Board, the Board's functions under the Act are being performed by the Joint Committee on Landmarks. *See id.*, § 5–823(a).

**5.** Under procedures established by the Joint Committee on Landmarks for the designation of historic landmarks and districts, categories are defined as follows:

"Category I" means *Historic Landmarks* and *Historic Districts* of great importance which contribute significantly to the national cultural heritage or that of the District of Columbia and its environs and which must be preserved.

"Category II" means *Historic Landmarks* and *Historic Districts* of importance which contribute significantly to the cultural heritage or visual beauty and interest of the District of Columbia and its environs and which should be preserved or restored.

"Category III" means *Historic Landmarks* and *Historic Districts* of value which contribute to the cultural heritage and visual beauty and interest of the District of Columbia and its environs and which should be preserved or restored.

23 D.C.Reg. 1402, 1403 (1976).

preservation of all three landmarks to their total demolition. In assessing the various options, the architect's main objective was to design a project combining the revitalization of a portion of downtown Washington with the preservation of those historic structures which, by virtue of their scale and design, would contribute to that revitalization. In line with this objective and in light of preliminary cost analyses, the Carr Company gave further consideration to four of the nine alternatives:

(1) Retain Rhodes Tavern and the facades of the Keith-Albee and Bank buildings;

(2) Retain the facades of the Keith-Albee and Bank buildings, without Rhodes Tavern;

(3) Retain only Rhodes Tavern; and

(4) Demolish all three structures to allow all new construction.

In the meantime, after applying for demolition permits for the three structures, intervenor Carr began negotiating with the city for assistance in obtaining grants to fund preservation of the landmarks.[6] Carr also negotiated with local preservation groups, including the Joint Committee on Landmarks and Don't Tear It Down, Inc., in an effort to gain their support. When it became clear that funding sufficient to retain all three structures would not be forthcoming, demolition of the rear portion of the Keith-Albee building began (pursuant, of course, to a permit). On April 25, 1979, Don't Tear It Down filed suit in the Superior Court in an effort to stop the demolition. *Don't Tear It Down, Inc. v. Oliver T. Carr Co.*, Civil Action No. 5046–'79. Shortly, thereafter, the trial court ruled that demolition could proceed since the city had failed in its efforts to secure adequate public funding to retain all three structures. Negotiations among Carr, the city, and Don't Tear It Down continued. From those, the current proposal emerged. Since the District government—with the concurrence of Don't Tear It Down—placed a higher priority on retention of the facades of the Keith-Albee and Bank buildings (because of their scale and design in relation to the Treasury building) over retention of the substantially smaller Rhodes Tavern, an agreement was reached whereby Carr could construct a complex that would; (1) retain the 15th Street facade and at last four bays of the G Street facade of the Keith-Albee building; (2) retain the 15th Street facade of the Bank building; (3) either donate Rhodes Tavern to a nonprofit organization for relocation, or demolish it; and (4) relocate the interior of the Old Ebbitt Grill within the new commercial structure.

Intervenors applied for the permits needed to proceed with the project, including a permit for the demolition of Rhodes Tavern.[7] Pursuant to our historical preservation statute, the applications were referred to the Joint Committee on Landmarks for review. On October 18, 1979, the Joint Committee recommended that the Mayor's Agent hold a public hearing

> to determine if any of the three demolitions requested should be permitted and whether the alteration requested is a project of special merit. The Committee believes that the Rhodes Tavern, a Category II Landmark, which by definition should be preserved, if possible, should not be demolished or moved unless the Mayor's Agent determines that the proposed alteration is a project of special merit.

The Mayor's Agent conducted a public hearing on the applications on December 10, 11, and 13, 1979. On February, 11, 1980, finding the requested permits to be necessary to allow the construction of a project of special merit, the Mayor's Agent ordered the

---

6. At a formal negotiating session on May 17, 1978, Carr estimated the cost of preserving all three structures to be a little more than $5.9 million, of which the Carr Company was willing to assume $2 million if the other parties would work to secure the remainder. At a later session, the Carr Company revised its earlier estimate upward to $7.2 million based on increases in labor costs, interest rates, and other expenses attributable to delay.

7. A demolition permit must be obtained to allow either the relocation or razing of Rhodes Tavern.

issuance of the permits. This petition for review followed.

## II

In order to authorize issuance of a demolition permit to raze a historic landmark, the Mayor's Agent must find "that issuance of the permit is necessary in the public interest." D.C.Code 1980 Supp., § 5–824(e).[8] Under the Act, the phrase "necessary in the public interest" means "consistent with the purposes of this chapter as set forth in section 5–821(b) or necessary to allow the construction of a project of special merit." Id., § 5–822(j).[9] A project of "special merit" is one "having significant benefits to the District of Columbia or to the community by virtue of exemplary architecture, specific features of land planning, or social or other benefits having a high priority for community services." Id., § 5–822(k).

In her order of February 11, 1980, the Mayor's Agent found the proposed project to be "one of special merit by virtue of exemplary architecture ... because of the sensitive incorporation of the facades of the Keith-Albee Building along with that of the adjacent National Metropolitan Bank Building into the total project."[10] Additionally,

she found that issuance of the permits was "necessary to allow the construction of a project of special merit."[11]

■ Petitioner contends that the Mayor's Agent failed to apply the proper statutory standard which, in its view, compels a balancing of the historical values to be lost by demolition against the special merit of the proposed project. Intervenors contend, on the other hand, that the statute specifically requires a finding that a project is one of special merit—with the concomitant finding of necessity to issue a demolition permit in order to allow the project to go forward— and no more. We agree with petitioner that a balancing of historical and development values is required under the Act, but we conclude that the appropriate balance was struck in this case.

Determinations under a locality's historic preservation statute "should not be made in a vacuum. The architectural and historical characteristics of a building must be weighed against its societal functions and the significance of its preservation in human terms." Young v. Mellon, 156 Cal. Rptr. 165, 169 (1979). While our statute focuses on a finding of "special merit" as

8. Alternatively, a permit may issue upon a finding that failure to issue one "will result in unreasonable economic hardship to the owner." Id. Intervenors have not made such a claim in this case.

9. Section 5–821(b) provides in pertinent part:
　(b) It is further declared that the purposes of this chapter are:
　　*　　*　　*　　*　　*　　*
　(2) with respect to historic landmarks:
　(A) to retain and enhance historic landmarks in the District of Columbia and to encourage their adaptation for current use; and
　(B) to encourage the restoration of historic landmarks.

10. More particularly, she concluded that:
　The facades of these two structures create a major design impact at one of the most strategic locations along the ceremonial route between the Capitol and the White House. Visually and architecturally integral parts of the 15th Street financial district, these facades offer particular reinforcement to the monumentality and powerful rhythm of the colonnaded east side of the U. S. Treasury

Building. They create a sense of ceremonial closure before the climactic turn of the route onto Pennsylvania Avenue toward the White House. The scale, massing, fenestration, and other details of the facades of the Keith-Albee and National Metropolitan Bank Buildings are continued into the new construction at the southwest corner of the block so that the sense of monumentality and rhythm is achieved along the entire 15th Street frontage.

11. Specifically, with respect to Rhodes Tavern, she found that:
　[Issuance of the] permits requested for demolition or relocation of the structure known as Rhodes Tavern to allow the construction of a contemporary structure complementing the scale, massing and monumentality and continuing the cornice lines of the Keith-Albee and National Metropolitan Bank Buildings, Category II Landmarks and sympathetically relating to the scale and design of the U. S. Treasury, a Category I Landmark ... is necessary to allow the construction of a project of special merit.

the critical factor in permitting demolition of a historic landmark to allow for new construction, by its very nature it also requires more. With its emphasis on "safeguard[ing] the city's historic, aesthetic and cultural heritage, as embodied and reflected in [its] landmarks and districts," D.C.Code 1980 Supp. § 5–821(a)(2), the Act implicitly requires that, in the case of demolition, the Mayor's Agent balance the historical value of the particular landmark against the special merit of the proposed project.

While the decision of the Mayor's Agent in this case might appear to turn almost exclusively on her finding that the proposed project is one of special merit, implicitly she undertook a proper value-balancing analysis in order to reach that ultimate conclusion. In Finding No. 2 of the findings of fact and conclusions of law which accompanied her Order, the Mayor's Agent noted that Rhodes Tavern "is a Category II Landmark on the District of Columbia's Inventory of Historic Sites and has been listed in the National Register of Historic Places since March 24, 1969." In Finding No. 11, she elaborated, observing that "Rhodes Tavern, constructed between 1799 and 1801, is the oldest extant commercial structure in downtown Washington and is an example of vernacular Federal architecture." She incorporated by reference the more detailed descriptions of Rhodes Tavern contained in the October 18, 1979, report to her of the Joint Committee on Landmarks and in the document supporting nomination of Rhodes Tavern to the National Register. A review of those descriptions is revealing. The documents do laud the historical significance of Rhodes Tavern.[12] However, they also admit candidly that the architectural integrity of the structure has been seriously impaired. Noting that "[t]he building has been much altered in its 168 [now 180]-year history," the National Register nomination stated:

Although the first floor was changed many times to accommodate different commercial establishments, the building remained largely intact until around 1957 when the five northern bays of the 15th Street wing were razed, leaving only three bays (approximately 30′) of the original 76′, and making the building rectangular rather than L-shaped. The building fabric is now in poor condition. The stucco which was applied to the brick sometime after 1903 and which also covers the adjoining building at 1429 F Street is badly cracked and needs paint.

The interiors of the three stores which now occupy the ground floor [as of March 24, 1969] show no trace of original architectural detail. The original chimneys, as shown in the 1817 sketch [by the Baroness de Neuville, wife of the French minister] and a 1903 photograph, no longer exist. The store fronts, and windows and original ground floor entrances no longer exist or have been so changed as to be unrecognizable.

Additionally, during the three-day public hearing, the Mayor's Agent took extensive testimony with respect to the historical nature of Rhodes Tavern, including some which cast doubt on whether certain events purported to have taken place there actually did. The Mayor's Agent also received a substantial number of written comments, many of which focused on Rhodes Tavern's historical significance. The Mayor's Agent's findings of fact and conclusions of law are based entirely on the record. Her detailed findings of fact reflect a consideration of both the historical value of Rhodes Tavern and the structure's relationship—or lack thereof—to its neighboring landmarks. The record fully supports our conclusion that historical considerations

---

12. The Joint Committee's Report stated in part: The Rhodes' Tavern, the oldest extant commercial structure in Washington's Downtown Area, served as a polling place in the first municipal election of 1802, as one of the first banks in the District, and was the tavern from which the British command directed the burning of the White House and Treasury in 1814. It was also the first home of the banking institution which is now Riggs National Bank. The building has been in continuous commercial use since it was built and its site has been historically important as a hub of commerce and finance since the foundation of the city.

were properly balanced against the special merit of the proposed project.[13]

■ In the future, we expect the Mayor's Agent in any proceeding under the Act to state with a higher degree of precision which historical values associated with a particular landmark or historic district were considered with respect to a permit application and whether these historical considerations outweigh, or are outweighed by, the merits of that application.[14] This requirement will not apply to administrative decisions rendered prior to the guidance we provide in this opinion as long as we are able to conclude, as we do here, that the Mayor's Agent substantially complied with the requirements of the Act. *See Wheeler v. Board of Zoning Adjustment*, D.C.App., 395 A.2d 85, 90 (1978). All that the Act expressly requires is a finding that issuance of a permit is necessary in the public interest which, in turn, is defined as necessary to allow the construction of a project of special merit. The recommendation of the Joint Committee to the Mayor's Agent was to deny the application for the demolition permit for Rhodes Tavern unless she found the proposed project to be one of special merit. The Mayor's Agent complied with those directives. We are satisfied that, in the course of doing so, she weighed the historical considerations underlying those directives against the special merit of the project, a balancing process which we now declare that the Act implicitly requires.

III

■ According to petitioner, the conclusion of the Mayor's Agent that issuance of a demolition permit for Rhodes Tavern is necessary to construct a project of special merit is not supported by substantial evidence in the record.[15] Specifically, petitioner argues that, in order to find demolition necessary, the Mayor's Agent must conclude that there is no feasible (in its view) alternative way to complete the project. We rejected that argument in *Don't Tear It Down, Inc. v. Department of Housing and Community Development, supra.*

As noted earlier, intervenors considered a number of alternative design proposals for this project. Intervenor Carr directed his architect to determine the feasibility of preserving all three landmarks on the block; a proposal which would have accomplished this objective was included among nine alternatives prepared for consideration. The alternative which provided for the retention of all three structures was given further study, having been included when the nine alternatives were cut to four. That alternative was rejected only after protracted negotiations between the developers and various public and private community

---

13. Although the Mayor's Agent premised her finding of special merit in this case on "exemplary architecture," we note that the record also contains evidence with respect to the projected economic benefit to the city of the proposed development. Intervenor Carr testified, for example, that the District government stands to gain in excess of $2 million in tax revenues from development of the property site and that the project will create more than 2,000 permanent jobs, of which 50 percent will be in low or moderate income categories. This is another factor militating in favor of a finding of special merit, D.C.Code 1980 Supp., § 5–822(k), and is a proper consideration in reviewing the grant of a demolition permit to raze a historical landmark. *See Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco*, 106 Cal.App.3d 893, 901, 165 Cal.Rptr. 401, 405 (1980).

14. *Compare Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco, supra* note 13, 106 Cal.App.3d at 917, 165 Cal.Rptr. at 415 (balancing requirement in state's historical preservation statute does not insure that decision made with environmental and historical consequences in mind will always be those which favor the environmental and historical considerations), *with Mayor and Aldermen of City of Annapolis v. Anne Arundel County*, 271 Md. 265, 295, 316 A.2d 807, 823 (1974) (denial of demolition application despite clear and uncontradicted testimony as to merit of proposed public improvement on site of historic landmark could be denial of due process).

15. Under § 5–832(b) of the Act, demolition proceedings are to be conducted in accordance with the applicable provisions of the District of Columbia Administrative Procedure Act. D.C. Code 1973, §§ 1–1501 *et seq.* Accordingly, the findings of fact and conclusions of law in this case must be supported by substantial evidence. *Id.*, § 1–1509(e).

groups which resulted in: (1) a recognition of the inability to obtain sufficient public funding to preserve all three landmarks, and (2) the determination by the city—which Don't Tear It Down endorsed—that higher priority should be given to the retention of the Keith-Albee and Bank building facades than to the preservation of Rhodes Tavern. Consideration of the various alternatives, and the persistent efforts to secure funding to preserve all three structures, were noted in Findings 12 through 21 which accompanied the Order of the Mayor's Agent (and were supported by substantial evidence). These findings, taken as a whole, lead rationally to the conclusion of the Mayor's Agent that issuance of a demolition permit for Rhodes Tavern is necessary in order to construct a project of special merit.

Petitioner makes much of intervenor Carr's testimony before the Mayor's Agent to the effect that the developers intended to go forward with the project even if the demolition permits were not granted. We are not persuaded that this statement (which Carr was pressed to make on cross-examination) means that demolition of Rhodes Tavern must not be necessary after all. In *Don't Tear It Down, Inc. v. Department of Housing and Community Development, supra,* we imposed a reasonableness limitation on the consideration of alternatives to demolition.

Reasonableness must be imputed into the "necessary" standard, and at the hearing on each "special merit" permit, factors including but not limited to cost, delay, and technical feasibility become proper considerations for determining "necessary." * * * Each of these factors has bearing on whether there are viable alternatives to demolition available, and the answer to this question determines necessity. [*Id.,* 428 A.2d at 380.]

██ Consequently, it was entirely proper for the Mayor's Agent to consider evidence offered by intervenors showing that preservation of all three structures would cost upward of $7.2 million. Absent public funding, it is apparent that petitioner ex-pects intervenors to bear this cost alone and that, if they do, demolition of Rhodes Tavern will not be necessary. However, as one court has stated: "It is laudable to attempt to preserve a landmark; however, it becomes unconscionable when an unwilling private party is required to bear the expense." *Galich v. Catholic Bishop of Chicago,* 75 Ill.App.3d 538, 31 Ill.Dec. 370, 394 N.E.2d 572, 577 (1979), *cert. denied,* 445 U.S. 916, 100 S.Ct. 1277, 63 L.Ed.2d 600 (1980), quoting *People ex rel. Marbro Corp. v. Ramsey,* 28 Ill.App.2d 252, 256, 171 N.E.2d 246, 247 (1960). Requiring private parties to spend substantial sums of money to preserve landmark structures—with little or no public assistance—could rise to the level of an unconstitutional taking. *See Maher v. City of New Orleans, supra,* 516 F.2d at 1066–67. Moreover, development—so vital to a city's growth—could be stymied irreparably. "By placing the costs of architectural preservation squarely on the landmark owner, design and demolition controls may actually discourage private citizens from purchasing and maintaining landmark property. Failure to offset the economic burdens of landmark designation will 'create a class of buildings which will be shunned like lepers.'" Comment, *Allocating the Cost of Historic Preservation: Compensation for the Isolated Landmark Owner,* 74 Nw.L. Rev. 646, 649 (1979) (footnote omitted).

██ Under the Act, therefore, demolition is necessary in order to construct a project of special merit whenever retention of the landmark on its original site becomes economically oppressive. *See generally Lafayette Park Baptist Church v. Board of Adjustment of St. Louis,* 599 S.W.2d 61, 66 (Mo.App.1980). A developer should be required to show that all reasonable alternatives were considered. As we recently stated, that does not mean that a developer may select the least expensive alternative and summarily reject those which are more costly. *Don't Tear It Down, Inc. v. Department of Housing and Community Development, supra,* 428 A.2d at 379–380. However, that is not what occurred in this case. In light of the Mayor's Agent's findings

that the intervenors considered alternatives to preserve Rhodes Tavern and that they voluntarily delayed demolition proceedings until efforts to secure public funding which exhausted, we conclude that the evidence in the record was sufficient to support her conclusion that the issuance of a demolition permit is necessary to construct a project of special merit.

## IV

■ Petitioner's final challenge to the Act (or to its interpretation by the Mayor's Agent) is its contention that the statute is impermissibly vague. More particularly, petitioner calls into question the validity of the statutory phrase "exemplary architecture" as a basis for a finding of special merit, D.C.Code 1980 Supp., § 5–822(k), arguing that the phrase requires an aesthetic judgment and is thus a delegation of authority to the Mayor's Agent without standards. We disagree.

"[C]oncerns of aesthetic or historical preservation do not admit to precise quantification." *Maher v. City of New Orleans, supra*, 516 F.2d at 1062 (historical preservation statute does not delegate unfettered authority to decisionmaking body). Those courts which have considered similar provisions have found "historical and/or architectural" language sufficiently definite to pass constitutional muster, *South of Second Associates v. Georgetown*, 196 Colo. 89, 92, 580 P.2d 807, 810 (1978) (en banc) (and cases cited therein), especially in light of other objective factors which the decisionmaker in a particular case is required to consider. *Id.*, at 94, 580 P.2d at 811. In that regard, the rules of procedure adopted as final rules on July 12, 1979, to supplement the Act are instructive. *See* 26 D.C.Reg. 263–89 (1979). Rule 3.3(b)(2) provides that where an applicant seeks a demolition permit on the

ground of special merit and the claim of special merit is based on "exemplary architecture," the applicant must file with the Mayor (or his Agent) "architectural drawings of sufficient completeness to indicate the exterior design of the building or structure." *Id.*, at 283. The term "design" encompasses "exterior architectural features including height, appearance, texture, color and nature of materials." Rule 1.1(g), *id.*, at 264. These objective factors which must be considered by the Mayor's Agent in weighing a claim of special merit based on "exemplary architecture" give substance to that challenged phrase and render it sufficiently concrete to withstand a claim of unconstitutional vagueness.

In this case, detailed architectural drawings and descriptions fully comporting with the definitions set forth above were submitted. Consideration of the architectural nature of the project in objectively quantifiable terms is reflected in Finding No. 21 of the findings of fact. Hence, there is no merit to the claim that the Mayor's agent, in finding special merit based on exemplary architecture, acted without standards or that the phrase "exemplary architecture" is impermissibly vague.

## V

■ Finally, petitioner contends that the Mayor's Agent erred in denying its prehearing motion that she disqualify herself in favor of appointing an independent retired judge or a professional arbitrator to decide this case. Petitioner's claim is that it was denied due process by the appearance of unfairness arising from the status of the Mayor's Agent as an employee of the District of Columbia,[16] combined with the public support for the project which had been expressed by the Mayor and other city officials.[17] We find no merit in this claim.

---

**16.** Pursuant to § 5–822(h) of the Act, the Mayor delegated his responsibilities under the Act to the Director of the Department of Housing and Community Development, *see* 25 D.C.Reg. 9564 (1979), who in turn designated one of his special assistants as the Mayor's Agent for purposes of the Act.

**17.** For example, on June 13, 1979, the District government issued a news release in which it outlined cooperative efforts between the city and the Carr Company aimed at securing public funds for the retention of the landmarks. A letter of August 6, 1979, from the Mayor to intervenor Carr in which the Mayor expressed his personal commitment "to working with you

This is not a case in which the decision-maker has been the recipient of ex parte communications from an advocate for one side of the issue, *see Quick v. Department of Motor Vehicles*, D.C.App., 331 A.2d 319 (1975), nor is it an instance of personal interest or bias on the part of the decision-maker. *See Cinderella Career and Finishing Schools, Inc. v. F.T.C.*, 138 U.S.App.D.C. 152, 425 F.2d 583 (1970). In the absence of either of these circumstances, we cannot conclude that petitioner was denied due process.

Nor was there an appearance of unfairness. That the Mayor had issued public statements supporting the project in no way reflects prejudgment on the part of the Mayor's Agent. Rather, we are convinced that this case was decided properly on the basis of an extensive and complete record. As the Mayor's Agent pointed out in denying the motion for disqualification: "A final decision must be based on the evidence of record of the public hearing and accompanied by findings of fact and conclusions of law; and ... the Mayor's Agent is required to follow the ethical rules of the D.C. Administrative Procedure Act and Rules of Procedure pursuant to [the Act]." She went on to state that she had not received, and would not receive, any direction from the Mayor or from the Director of her Department as to what decision she ultimately would reach. Moreover, intervenors never were led to believe otherwise. In response to a request from intervenor Carr for official assistance in winning approval of the project from the Historic Preservation Review Board, the Assistant City Administrator for Planning and Development correctly noted that any demolition permits needed to go forward with the project were subject to the discretion of the Mayor's Agent and that "[a]ny final decision must be made on the record presented." We have no reason to suspect that the decision was made in a manner other than one conforming fully with the requirements of law. Under these circumstances, absent a showing of any interest in the outcome of the case, and with no actual bias even having been alleged, *see Morrison v. Board of Zoning Adjustment*, D.C.App., 422 A.2d 347, 351 (1980), we are unable to conclude that, by the Mayor's Agent's conducting of these proceedings, "the image of the administrative process [was] transformed from a Rubens to a Modigliani." *Cinderella Career and Finishing Schools, Inc. v. F.T.C., supra*, 138 U.S.App. D.C. at 159, 425 F.2d at 590.

For all of the foregoing reasons, the Order of the Mayor's Agent is

*Affirmed.*

---

to complete your exciting project in this key location in the heart of our City," received press attention. Further, the Assistant City Administrator for Planning and Development testified before the Mayor's Agent in favor of the project, specifically recommending it on behalf of the city as a project of special merit.