COMMITTEE OF 100 ON THE
FEDERAL CITY, Petitioner,

v.

DISTRICT OF COLUMBIA DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS, et al., Respondents,

S.J.G. Properties, Inc., Intervenor.

No. 88–330.

District of Columbia Court of Appeals.

Argued Nov. 2, 1989.
Decided March 8, 1990.

Cornish F. Hitchcock, with whom Richard B. Nettler, Washington, D.C., was on the brief, for petitioner.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel, Washington, D.C., at the time the Memorandum In Lieu of Brief was filed, were on the Memorandum In Lieu of Brief, for respondents.

Louis P. Robbins, with whom Christopher Collins and Allison M. Carney, Washington, D.C., were on the brief for intervenor.

Tersh Boasberg, with whom Nathalie V. Black, Washington, D.C., was on the brief, for amici curiae Nat. Trust for Historic Preservation, Nat. Alliance of Preservation Commissions, Nat. Center for Preservation Law, American Institute of Architects (D.C. Chapter), Preservation Action, Capital Hill Restoration Soc., Cleveland Park Historical Soc., and Dupont Circle Conservancy.

Before ROGERS, Chief Judge, and FERREN and SCHWELB, Associate Judges.

ROGERS, Chief Judge:

Petitioner, the Committee of 100 on the Federal City (the Committee of 100), seeks review of an order of the Mayor's Agent under the Historic Landmark and Historic District Protection Act of 1978 (Preservation Act), D.C.Code §§ 5–1001 *et seq.* (1988 Repl.), granting the applicant-intervenor S.J.G. Properties, Inc. (S.J.G.) a permit to demolish the Woodward Building, located within the Fifteenth Street Financial Historic District. The Committee of 100 contends that the amenities, consisting of ap-

proximately 30,000 square feet of residential space supplemented by a day care center for at least 57 persons, offered by the replacement building proposed by S.J.G., do not support a finding of special merit under the Preservation Act, D.C. Code § 5-1002(11). The Committee also contends that the decision of the Mayor's Agent is not based on substantial evidence that the amenities are feasible, and that the Mayor's Agent erroneously factored into her special merit analysis the economic feasibility of the Woodward Building's renovation. Finally, the Committee of 100 contends that the Mayor's Agent may not use a covenant to bind a private owner on behalf of the District of Columbia. Even deferring to the Mayor's Agent's interpretation of the nature of the factors that would suffice for a project of special merit, and her conclusion that the residential and day care amenities were sufficiently special under the Preservation Act for a project of special merit, we conclude that the Mayor's Agent's order fails to address material issues relating to the feasibility of the proposed amenities and leaves undefined the nature of the covenant which was a central element of the special merit finding.

I

On September 24, 1986, S.J.G. applied for a permit to raze the Woodward Building and construct a new office building with underground parking at the site. The Historic Preservation Review Board unanimously voted to deny the application on the ground that demolition would be inconsistent with the purposes of the Preservation Act. D.C.Code § 5-1003(c)(1).[1] Hearings were held before the Mayor's Agent at which the Committee of 100 and the Advisory Neighborhood Commission 2B joined as parties in opposition to the application for a demolition permit.

By order of February 19, 1988, the Mayor's Agent found that S.J.G.'s proposal to demolish the Woodward Building is necessary in the public interest because it is consistent with the purposes of the Preservation Act and because it constitutes a project of special merit. The Mayor's Agent rejected S.J.G.'s claim that its project was of special merit by reason of exemplary architecture but accepted its claim of special merit based upon the special features of land planning that will promote the District's land planning objectives. In concluding that demolition of the Woodward building was necessary to construct a project of special merit, the Mayor's Agent "weigh[ed] the city's high priority for establishing a 'critical mass' of housing in the Downtown area" which market forces alone will not produce, the provision for day care services, and the absence of significant economic incentive for the owner of the building to renovate and maintain it.

The Mayor's Agent defined the special merit of the project in terms of the provisions of the new building for residential housing, day care, and parking. She therefore approved issuance of the demolition permit but made it subject to four conditions: (1) execution and recordation of a legally valid covenant between S.J.G. and the District of Columbia to run with the

---

1. The Staff Report and Recommendation, adopted by the Historic Preservation Review Board, explained that the Woodward Building is important as "an integral part of a historic district whose cohesiveness stems from common dates of construction, common history and the use of a common design vocabulary and philosophy." A new building, the report stated, "even one of high design quality, will inevitably reflect present-day technology and architectural style, and will disrupt the special sense of time and place represented by the Financial District."

As a result of this conclusion, the Review Board did not consider S.J.G.'s request to rule on the conceptual design of the proposed new building, as is required in most cases proposing new construction in a historic district. D.C. Code § 5-1007(f). The review was unnecessary because the matter was referred to the Commission of Fine Arts (Commission), which is charged with reviewing proposed construction on this site under the Shipstead–Luce Act (D.C. Code § 5-410). D.C.Code § 5-1007(b).

The Commission on January 15, 1986, preliminarily approved the conceptual design of the new building, noting that if the District's preservation authorities had no objection to razing the Woodward building, then the Commission had no objection to the design for the proposed replacement building, subject to certain design changes if and when more detailed plans for the replacement building became available.

land and commit S.J.G. to use the top two floors of the proposed building for permanent residents, not transient business executives, and to use part of the building for a day care center capable of accommodating at least 57 children at a lease rate which will ensure its permanent operation; (2) submission of a day care feasibility study setting a proposed lease rate for the day care center; (3) a certificate of occupancy restricting the use of the top two floors for use by permanent residents and a portion of the square footage for use as a day care center; and (4) simultaneous issuance of a permit for new construction and demonstration by S.J.G. of its ability to complete the project.

The Committee of 100 seeks reversal of the February 19, 1988 order of the Mayor's Agent on three principal grounds: that the proposed project's amenities do not support a finding of special merit, that the Mayor's Agent's finding of special merit is not supported by substantial evidence of the feasibility of the amenities, and that her special merit analysis erroneously included consideration of the economic feasibility of renovation of the Woodward Building. Alternatively, the Committee seeks a remand for further proceedings relating to the feasibility requirements of the amenities and the covenant.

## II

The Preservation Act provides that no permit shall issue to demolish a historic building or structure in a historic district "unless the Mayor finds that issuance of the permit is necessary in the public interest, or that failure to issue a permit will result in unreasonable economic hardship." D.C.Code § 5–1004(e).[2] The Act defines "necessary in the public interest" as "consistent with the purposes of this [Act] as

set forth in § 5–1001(b)[3] or necessary to allow the construction of a project of special merit." D.C.Code § 5–1002(10). A project of "special merit" is "a plan or building having significant benefits to the District of Columbia or to the community by virtue of exemplary architecture, special features of land planning, or social or other benefits having a high priority for community services." D.C.Code § 5–1002(11).

The Committee of 100 contends that because the amenities relied on by the Mayor's Agent were not within the "special merit" project exception to preservation, the Mayor's Agent erred in applying a balancing test between the value of the historic structure and the merits of the proposed project. The Committee of 100 maintains that the Mayor's Agent may only engage in such a balancing test if the proposed amenities are sufficiently "special" to warrant inclusion on the special merit side of the equation.

 This court "must uphold the Mayor's Agent's decision if her findings of fact are supported by substantial evidence in the record considered as a whole and the conclusions of law flow rationally from those findings." *MB Associates v. D.C. Dep't of Licenses, Investigation and Inspection,* 456 A.2d 344, 345 (D.C.1982), and cases cited; D.C.Code § 1–1510(a)(3)(E) (1987 Repl.). The findings of fact must be based on substantial evidence on each material contested issue, and the Mayor's Agent must reach rational conclusions based on these findings. *Committee for Washington's Riverfront Parks v. Thompson,* 451 A.2d 1177, 1193 (D.C.1982). *See Don't Tear It Down, Inc. v. District of Columbia Dep't of Housing and Community Development,* 428 A.2d 369, 378 (D.C. 1981); D.C.Code § 1–1509(e). In a demoli-

---

**2.** S.J.G. does not contend it should be permitted to raze the Woodward Building on the basis of unreasonable economic hardship.

**3.** The purposes of the Preservation Act with respect to historic districts are:

(A) To retain and enhance those properties which contribute to the character of the historic district and to encourage their adaptation for current use;

(B) To assure that alterations of existing structures are compatible with the character of the historic district; and

(C) To assure that new construction and subdivision of lots in a historic district are compatible with the character of the historic district.

D.C.Code § 5–1001(b)(1).

tion case, a determination by the Mayor's Agent that a project is of special merit implicitly includes the finding that issuance of a demolition permit is necessary in order for the proposed project to proceed. *Citizens Committee to Save Rhodes Historic Tavern v. District of Columbia Dep't of Housing and Community Development,* 432 A.2d 710, 716 (D.C.1981). Consequently, this court has held that the Mayor's Agent must balance the value of the community of the historic structure against the special merit of the proposed project. *Id.*

### A. Special Merit Project

■ The Preservation Act requires that a proposed amenity meet a high standard in order to qualify as a "special merit" project, the construction of which would warrant demolition of a building of historical significance. The social benefits to be included in a special merit project must have a "high priority" for community services. D.C.Code § 5–1002(11). Thus, "[f]actors which are common to all projects are not considered as special merits." REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA COMMITTEE ON HOUSING AND URBAN DEVELOPMENT ON BILL 2–367, "THE HISTORIC LANDMARK AND HISTORIC DISTRICT PROTECTION ACT OF 1978," at 6 (October 5, 1978). *See MB Associates, supra,* 456 A.2d at 346 (affirming denial of demolition permit for Bond Building on ground proposed office building was not a project of special merit since proposed contribution was common to all downtown development).[4] The designation of a landmark structure or historic district constitutes a formal determination that the designated

properties are worthy of "protection, enhancement and perpetuation" as "distinctive elements of the city's cultural, social, economic, political and architectural history." D.C.Code § 5–1001(a)(1). In order to justify the permanent loss and demolition of such a valuable structure, therefore, the Preservation Act demands it be replaced with something sufficiently "special." While the Preservation Act does not require that a project of special merit be of epic proportions, the position attributed to the Committee of 100 by S.J.G.,[5] the Preservation Act is not standardless. A project of special merit must have "significant benefits to the District of Columbia or to the community by virtue of exemplary architecture, specific features of land planning, or social or other benefits having a high priority for community services." D.C.Code § 5–1002(11).

The Mayor's Agent noted S.J.G.'s claim that specific features of land planning would further the goals and objectives of the District of Columbia Comprehensive Plan and found the project to be one of special merit because of its provision of social or other benefits having a high priority for community service. S.J.G. maintained that its provision of residential housing on the top two floors will "help promote the District government's established goal of creating a 'Living Downtown' and will help to extend activity in the area into the evening hours." The owner further contended the day care services would meet "a clearly identified need for day care that is located in close proximity to the work place and will enhance the area's appeal to prospective tenants." He also

---

4. The proposed amenities in *MB Associates* involved economic revitalization, new open spaces, infusion of private capital to an area, attraction of "first class" office and retail tenants, parking facilities four grades below street level, and the addition of beauty and function to the interior of the building. *HPA No. 81–521, Application for a demolition permit for a building located at 1406 New York Avenue, N.W., Lot 18 in Square 223,* at 10 & 11, Findings of Fact Nos. 35 & 40, (May 11, 1981), *aff'd sub nom., M.B. Associates,* 456 A.2d 344 (D.C.1982).

5. The Committee of 100 notes in its brief that past projects of special merit have included the District of Columbia Convention Center (one-of-

a-kind building), the PEPCO substation in Georgetown (provision of electrical service conceded to be a project of special merit), an arts exhibition center, and a block long structure consisting of a mix of land uses connected with the Convention Center and ensuring activities downtown at different times of day and night. In each of the approved special merit projects the amenities were designed to benefit more than just a small group of people, and in the case of one of them, the Homer Building, the proposal incorporated significant portions of the affected structure and was found to be exemplary architecture.

stated that S.J.G.'s participation in the D.C. Rideshare Program, and its provision of parking in the building, would help to attract major commercial tenants which would promote the economic vitality of the historic district, and noted the proposed improvements in use of the street and a pedestrian plaza. In our court, however, the District agrees with the Committee of 100 that only the housing and day care proposals are bases on which the special merit finding can properly rest.

The housing and day care components of S.J.G.'s proposal appear only in very general outline, and even if they could be found in a general sense under some circumstances to meet the high standards required for a project of "special merit," the Mayor's Agent failed to respond to material and relevant objections made at the hearing that such housing and day care amenities could be provided in a renovated Woodward Building and that the proposals were lacking any details to demonstrate their feasibility. To the extent that the Mayor's Agent relied on the District's Comprehensive Plan, the Committee of 100 argues persuasively that she relied on excerpts that were taken out of context. While she might properly reject objections about feasibility based on land costs, since S.J.G. owned the land, she avoided the other objections by deferring their resolution to the subsequent development of a covenant between S.J.G. and the District of Columbia. Consequently, consideration of whether there was any reasonable economic incentive for S.J.G. to provide the amenities in a renovated building was premature.

In her findings, the Mayor's Agent devoted considerable attention to the proposals relating to parking. Since parking must be considered with every downtown project, see 11 D.C.M.R. 2101.1 (1987), it does not ordinarily qualify as an amenity of "special merit." See MB Associates, supra, 456 A.2d at 386. By contrast, there is summary treatment of the proposals for residential and day care services on which S.J.G. and the Mayor's Agent place great emphasis in concluding that demolition of the Woodward Building was consistent with the public interest. S.J.G. proposed that approximately 30,000 square feet, or two of the twelve floors, of the new commercial building would be devoted to residential use. In its proposed findings of fact and conclusions of law, S.J.G. proposed that 2,000 square feet would be used for day care services. S.J.G. did not offer evidence on the nature and type of residential unit, and the Mayor's Agent did not explain how she arrived at day care services for at least 57 persons.[6] We think that these findings are insufficient. See Nat'l Black Child Development Institute v. District of Columbia Board of Zoning Adjustment, 483 A.2d 687, 692 (D.C.1984); Citizens Association of Georgetown v. District of Columbia Zoning Commission, 402 A.2d 36, 42 (D.C.1979).

■ There also appears to be some confusion in the Mayor's Agent's reliance on the District's Comprehensive Plan as evidence of social policy. While day care is a priority for the greater District of Columbia community as a whole, the Comprehensive Plan focuses on indigent parents and does not direct that such programs be developed in the Downtown Area.[7] The Mayor's Agent's findings on the high cost of Franklin Square properties, moreover, disclose that residents in the neighborhood are unlikely to be indigent parents, and that the cost of day care is unlikely to be

---

6. S.J.G. suggests in its brief on appeal that the Mayor's Agent applied 29 D.C.M.R. 328.3, requiring 35 square feet per child for a day care center in quantifying the 2,000 square feet. S.J.G. also contends the housing materials and reports upon which it relied at the hearing provide sufficient evidence of feasibility. However, the brief of the Committee of 100 makes clear that reliance on these reports is either misplaced or insufficient.

7. The Mayor's Agent relies on Chapter 10 of the Plan which addresses "Human Services:"
 Sec. 1010. Policies in Support of the Income Maintenance and Economic Self–Support Services Objectives
 (5) Provide permanent residential settings, day-care services, and after school programs and provide family and health counseling, nutrition services, and employment training with income assistance programs for indigent parents; ....

within the means of working parents whom the Plan targets for assistance in the context of promoting economic self-support.[8] The Mayor's Agent similarly misconstrues the Plan's concept for residential downtown housing in her reference to a "critical mass of housing." The reference in the Plan to the "city's high priority for establishing a 'critical mass' in the Downtown area," is used in a very different context for a different purpose.[9] The Plan refers to a "critical mass of key land uses" and in view of the Plan's section targeting specific downtown areas for residential development, 10 D.C.M.R. § 903 (1987), which does not include the Financial District, it is more likely that the Plan envisions a mixture of commercial, cultural, retail and professional uses, rather than major housing development. Therefore, it is inappropriate in this case for the Mayor's Agent to factor in the Comprehensive Plan as though it supports S.J.G.'s proposal.

▆▆▆ The Mayor's Agent could properly consider factors associated with alternatives to demolition such as cost, delay and technical feasibility. *Citizens Committee to Save Historic Rhodes Tavern, supra,* 432 A.2d at 718; *Don't Tear It Down, supra,* 428 A.2d at 380. The reasonableness of the proposed project must be considered in the context of whether "there are viable alternatives to demolition available, and the answer to this question determines necessity." *Don't Tear It Down, supra,* 428 A.2d at 380. Although the Mayor's Agent found that the renovation of the Woodward Building is not economically feasible, we conclude that her conclusion is not persuasively supported by her findings of fact. Moreover, economic feasibility is just one factor to be considered in determining whether to allow demolition.[10]

The Mayor's Agent found that if S.J.G. were to renovate the Woodward, its return would be approximately 7.32 percent. The projected yield for typical downtown commercial-income producing properties is 7 to 9 percent. The Mayor's Agent found that in today's dollars, a renovated Woodward Building might command approximately $22.00–23.00 per square foot. Currently, S.J.G. receives approximately $15.00–16.00 per square foot. "Necessary" cannot be equated with "least expensive." *Id.* Where the economic burden of maintaining and preserving a historic building is onerous, the Preservation Act provides an owner with the opportunity to seek demolition on the separate ground of "unreasonable economic hardship." D.C.Code § 5–1004(e). Although S.J.G.'s general partner testified that he had no incentive to

8. Although the Mayor's Agent did require in her decision that S.J.G. ensure a reasonable lease rate to the day care facility, she offered no explanation of what a reasonable rate would be. Assuming she intended the services to be available to those sought to be served by the provision of the Comprehensive Plan, there is no finding, much less evidence, that such a lease rate would be feasible for S.J.G.

9. In a general statement about "Downtown Land Use," the Comprehensive Plan provides:
 The Downtown land use objective is to create a mix of different land use in Downtown that will attract and serve a variety of users, ensuring an active and productive Downtown at different times of day and night.
 The policies established in support of the Downtown land use objectives are as follows:
 (a) A variety of regulatory measures and incentives should be used to achieve an overall mix of land uses appropriate to creating an active Downtown, placing special emphasis on achieving a critical mass of key land uses in overall numerical terms and in geographical patterns; and

 (b) The land use "targets" should be used as guidelines for achieving an appropriate land use mix.
 10 D.C.M.R. §§ 901.1–901.2 (1987).

10. Amici curiae state in its brief that the Preservation Act does not use the phrase "economic infeasibility," and, therefore, the Mayor's Agent erred in considering it in determining whether or not S.J.G.'s proposal was a project of special merit. They further contend that this was error since S.J.G. did not seek permission to demolish the Woodward Building on the grounds of economic hardship under D.C.Code § 5–1004(e). They maintain also that special merit has nothing to do with the economics of renovation but rather with certain features of the new project, and that the Mayor's Agent erred in failing to consider whether demolition was "necessary" in order to provide the features she found were of special merit. They agree with the Committee of 100 that there is nothing "special" about such minor modifications of a larger commercial construction.

borrow $30 million at 9 percent interest to renovate the Woodward Building, he admitted that the partnership was receiving a modest return on the building. He rested his claim that he should be permitted to demolish the building on his assertion that the proposed new construction is a special merit project in the public interest.

 The weight accorded by the Mayor's Agent to her conclusion that renovation of the Woodward was not economically feasible is unclear. In her order she states that "[t]he issue is not whether a renovation can be done, but whether a Class "B" building can command the level of rents necessary to justify the extraordinary expense of renovation," and concludes that renovation of the Woodward is not feasible. The issue is not whether a Class "B" building can command the level of rents necessary to justify the expense of renovation, but whether demolition of the Woodward Building and the historic values statutorily ascribed to buildings located within historic districts is justified by the cost of renovation and by the benefits which the new building would bring to the community. Although we agree with the Mayor's Agent that economic feasibility cannot reasonably be assessed in a vacuum, a petition based on the alleged special merits of the project cannot be granted on the basis of strikingly different consideration.

 Moreover, as the Committee of 100 contends, the balancing of the historic value of the Woodward Building against the special merits of the project could not proceed until the Mayor's Agent found that the amenities proposed by S.J.G. were sufficient to constitute a project of special merit. In making the special merit determination, the feasibility of the amenities was a legitimate consideration.

## B. Feasibility of Amenities

 The Committee of 100 contends that the Mayor's Agent's decision was not based on substantial evidence that the housing and day care proposals proposed by S.J.G. were feasible.[11] In this court the District states that, in view of the need for further proceedings in connection with the covenant, there should be an on-the-record examination of the economic feasibility of the residential and day care proposals. Indeed, the District maintains that the permanence of the housing and day care services is an integral part of the complete project and that a finding of economic feasibility "is appropriate, if not mandated," particularly since market forces alone are generally unlikely to produce such results. The Committee of 100 views this as a concession that the Mayor's Agent's decision is not supported by substantial evidence. For purposes of this proceeding so do we. As the Committee of 100 points out, while S.J.G. "tried in a general way to show that these amenities were *desirable*, ... it submitted nothing to show that they could be successfully marketed or maintained in a way that would advance the goals attributed to them." The proposals for residential housing and day care were not a part of S.J.G.'s original proposal. S.J.G. presented no witnesses regarding the economic feasibility of housing at the site, which the Comprehensive Plan targets for "complete development ... as the major center of office development in Downtown," In addition, S.J.G. presented no witnesses regarding the kind of housing that would be provided, although a goal of the Comprehensive Plan is to protect and enhance the historic quality of the 15th Street Financial District. 10 D.C.M.R.

11. The Committee of 100 also contends that the Mayor's Agent erred in not requiring evidence on and making a finding as to S.J.G.'s ability to complete the new project. The Preservation Act does not require an evaluation of the applicant's ability to complete the proposed project until after a determination of special merit has been made. D.C.Code § 5–1004(h) (where demolition necessary for construction of project of special merit, "no demolition permit shall be issued unless a permit for new construction is issued simultaneously under § 5–1007 and the owner demonstrates the ability to complete the project."). Here, in addition to the statutory requirements, the Mayor's Agent conditioned her approval of the demolition permit on a number of additional events taking place before the demolition permit will issue, namely satisfactory resolution by S.J.G. with the District government of matters to be included in the covenant.

§ 931.1 (1987). The Mayor's Agent's determination that demolition was necessary required findings in some greater detail as to the amenities that were said to be of special merit, *see M.B. Associates, supra*, 456 A.2d at 346. These issues must be addressed as part of the contested case proceedings for determining whether to approve the application for demolition. D.C. Code §§ 5–1004, 1–1509(a).

### C. Covenant

 The Committee of 100 contends that approval of the demolition permit for the Woodward Building, conditioned on prior recordation of an approved and enforceable covenant, is unlawful and implicates the District in contract zoning. It relies on *Capitol Hill Restoration Society v. Zoning Commission*, 380 A.2d 174, 184–85 (D.C.1977), where the court adopted the views expressed by the Supreme Court of Wisconsin:

> We hold that when a city itself makes an agreement with a landowner to rezone the contract is invalid; this is contract zoning. However, when the agreement is made by others than the city to conform the property in a way or manner which makes it acceptable for the requested rezoning and the city is not committed to rezone, it is not contract zoning in the true sense and does not vitiate the zoning if it is otherwise valid. [*State ex rel. Zupancic v. Schimenz*, 46 Wis.2d 22, 30, 174 N.W.2d 533, 538 (1970).]

Of course, the instant case does not involve zoning. Arguably, as the District of Columbia maintains, the covenant called for by the Mayor's Agent would not commit the District to a particular course of action or intrude upon the rights of the

legislature since, as the holder of the covenant, the District has the right to choose whether to enforce it. The District defends the suitability of covenants, in part, by analogy to present zoning regulations [12] and to the Uniform Conservation Easement Act, D.C.Code §§ 45–2601 to –2605 (1989 Cum.Supp.), as promoting the general objectives of the Preservation Act and the Comprehensive Plan. The District interprets the Uniform Conservation Easement Act to include covenants and easements designed to ensure perpetual preservation of the special amenities that qualify as a special merit project authorized by the Mayor under the Preservation Act.

Although some special merit projects and the attendant amenities may fall within the scope of the Uniform Conservation Easement Act, S.J.G.'s project does not. The Act refers to covenants associated with natural, scenic or open space values and preservation of historical, architectural or cultural aspects of real property.[13] The covenant for S.J.G.'s project is to address the continued existence of housing and day care, not nature-related or culture-related values provided for in the Act. D.C.Code § 45–2601 *et seq.* The District's interpretation appears to falter on the plain meaning of the statutory language, and perhaps also, on its reliance on comments by the Commissioner on Uniform State Laws.

 Further, although S.J.G.'s proposed project would be subject to any zoning changes instituted by the District government and a covenant could include a reversion clause providing for the covenant's nullity in the event of conflicting zoning changes, there are problems with this approach. The Mayor's Agent did not

---

**12.** The zoning regulations condition building permits for planned development units on the recordation of a covenant between the property owner and the District government that binds the owners and its successors to use the property in the manner specified by the Zoning Commission. 10 D.C.M.R. 2407.3 (1987). The covenant binds the owner and all successors in title "to construct on and use the property only in accordance with the adopted orders or amended orders of the Zoning Commission." *Id.*

**13.** The Uniform Conservation Easement Act (the Act) encourages the District to create covenants, D.C.Code § 45–2604(a), for the purposes of

> retaining or protecting natural, scenic or open-space values of real property, ensuring its availability for agricultural, forestal, recreational, or open-space use, protecting natural resources, maintaining or enhancing air or water quality, or preserving the historical, architectural, archaeological, or cultural aspects of real property.

D.C.Code § 45–2601(1).

address whether the concerns raised by the Committee of 100 about the use and enforceability of covenants, in the context of demolition cases that have caused courts to ban contract zoning, should also rule out the use of covenants in historic preservation cases. The Committee of 100 referred to risks that special merit amenities secured by a covenant may be bargained away in the future, particularly where they involve use of a site as opposed to a building itself, and the risk of the unavailability of a zoning sanction upon breach of the covenant. In the absence of a decision by the Mayor's Agent regarding the nature of the covenant, further proceedings are required. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962) ("courts may not accept appellate counsel's *post hoc* rationalizations for agency [orders]."); *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 473, 102 L.Ed.2d 493 (1988) (no basis for deferring to agency counsel's interpretation of a statute where agency, to which legislature has delegated responsibility, has not articulated a position).

The contested case requirements of the D.C.Administrative Procedure Act, D.C. Code § 1–1509(a), apply where "the legal rights, duties, or privileges of specific parties are required by law (other than this subchapter) or by constitutional right, to be determined by a hearing before the Mayor or agency." D.C.Code § 1–1502(8). The Preservation Act provides for a public hearing in connection with the determination of whether a project is of special merit. D.C.Code § 5–1004. The Mayor's Agent

relies on the covenant as an essential aspect of S.J.G.'s proposed project, directing that a very specific covenant be created. She has ordered S.J.G. to negotiate with the District, by and through the Department of Consumer and Regulatory Affairs, in order to create a legally enforceable covenant that commits S.J.G. to use the top two floors of the building for permanent, non-transient, residents and to use a part of the building for a day care center to accommodate no fewer than 57 children. The District's concession that further proceedings are needed to flesh out the nature of the covenant is appropriate since it is only during the course of the contested case proceedings that parties in opposition will have an opportunity to make their concerns known and the applicant will have an opportunity to respond before the Mayor's Agent makes her final decision on the demolition application.

Accordingly, because the Mayor's Agent's order of February 18, 1988 fails to address material issues raised by the Committee of 100 in opposition to the application, the case is remanded for further proceedings.[14]

*So ordered.*

---

**14.** We do not reach the Committee of 100's contentions regarding the certificate of occupancy. *See* D.C.Code § 5–424(f) (1989 Repl.); 11 D.C.M.R. §§ 3203, 3204 (1987); 12A D.C.M.R. §§ 118–19 (1987). We also do not reach its contentions regarding submission of post hearing materials after the final hearing on April 10, 1987. *See* Rules of Procedure Pursuant to D.C.Law 2–144 "Historic Landmark and Historic District Protection Act of 1978" R. 3.10(b) ("[t]he record will be closed following the public hearing except that the record may be kept open for a stated period for the receipt of specific exhibits, information, or legal briefs, as may be directed by the Mayor"). The Mayor's Agent

directed that the record be kept open until May 11, 1987, provided the Committee of 100 with the opportunity to rebut the documents submitted by S.J.G. on the issues of housing and day care, and asked both counsel to submit legal memoranda addressing the legal issues of enforceability of covenants. *See also Committee for Washington's Riverfront Parks v. Thompson, supra*, 451 A.2d at 1184 ("[G]reater flexibility and discretion as to admission of [evidence] are permitted"), citing *Kopff v. District of Columbia Alcoholic Beverage Control Board*, 381 A.2d 1372 (1977). *See also Committee to Save Historic Rhodes Tavern, supra*, 432 A.2d at 720 (ex parte communication prohibited).