*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-AA-86

DC PRESERVATION LEAGUE, PETITIONER,

v.

MAYOR'S AGENT FOR HISTORIC PRESERVATION, RESPONDENT,

and

GEORGETOWN 29K ACQUISITION, LLC, INTERVENOR.

On Petition for Review of a Decision and Order of the Mayor's Agent for
Historic Preservation, District of Columbia Office of Planning
(OG Nos. 17-317, 17-361; HPA Nos. 17-263, 17-545, 17-633)

(Submitted March 31, 2020                          Decided August 27, 2020)

*Nicholas H. Jackson* for petitioner.

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile*, Deputy Solicitor General, and *Graham E. Phillips*, Assistant Attorney General, for respondent.

*R. Stanton Jones*, *William C. Perdue*, and *Samuel F. Callahan* for intervenor.

*James B. Wilcox, Jr.* for amicus curiae Committee of 100 on the Federal City.

*Richard Hinds* and *Stephen J. Crimmins* for amici curiae Citizens Association of Georgetown and Friends of Georgetown Waterfront Park.

Before EASTERLY, MCLEESE, and DEAHL, *Associate Judges*.

MCLEESE, *Associate Judge*: Intervenor Georgetown 29K Acquisition, LLC (G29K) applied for approval of a proposal to demolish most of the West Heating Plant, a historic landmark that was no longer in use, in order to construct a residential building and a public park. The Mayor's Agent approved the proposed demolition and found good cause to modify historic-preservation covenants in the deed that had conveyed the property from the United States to G29K. Petitioner DC Preservation League (DCPL) challenges those rulings. We affirm.

## I. Factual and Procedural Background

The Plant is located on a two-acre property in the southeast part of Georgetown, adjacent to the C&O Canal and Rock Creek. Originally purchased by the National Park Service in 1938, the property later became the site of a coal-fired heating plant for the federal government. The Plant eventually ceased functioning and was decommissioned and closed to the public in 2000.

The General Services Administration (GSA) sold the Plant and the surrounding property to G29K in 2013. The deed of sale included historic-preservation covenants that (a) required that changes on the property be consistent with the Secretary of Interior's Standards for the Treatment of Historic Properties

with Guidelines for Rehabilitating Historic Buildings, but (b) provided that although the covenants were binding in perpetuity, the State Historic Preservation Officer (SHPO) could, on a showing of good cause, modify or cancel some or all of the covenants.

G29K purchased the property in 2013. Before doing so, G29K conducted an environmental assessment and determined that, due to extensive water damage, any adaptive reuse of the Plant would require "essentially full demolition and reconstruction of the majority of the existing building structure." A subsequent environmental assessment revealed that the property contained numerous hazardous materials, including asbestos, lead, and mercury, which would require extensive removal of the exterior brick and interior walls.

G29K considered various uses for the structure, including a museum, artists' lofts, and office space, but ultimately rejected them as economically infeasible. After concluding that the project would be neither insurable nor economically viable without substantial demolition, G29K developed a plan to convert the Plant into a ten-story residential condominium building and the adjacent coal yard into a one-acre public park.

In Georgetown, project proposals are reviewed by the U.S. Commission of Fine Arts, which makes recommendations to the Mayor's Agent. D.C. Code § 6-1202 (2018 Repl.). The Commission reviewed and approved G29K's plan. Because the Plant is a historic landmark, G29K also submitted its plan to the Historic Preservation Review Board (HPRB) for review. *See* D.C. Code § 6-1104 (2018 Repl.). The HPRB concluded that, due to the substantial demolition involved, the proposal was inconsistent with the purposes of the Historic Landmark and Historic District Protection Act, D.C. Code § 6-1101 et seq. (2018 Repl.) ("Preservation Act"). The HPRB also found that the proposed design did not comply with the historic-preservation standards incorporated in the deed's historic-preservation covenants.

G29K then applied to the Mayor's Agent for approval of the proposed demolition. The State Historic Preservation Officer (SHPO) also submitted a letter asking the Mayor's Agent to determine whether there was good cause to modify the historic-preservation covenants in the deed. The SHPO agreed to implement the Mayor's Agent's determination.

The Mayor's Agent held two days of public hearings. Numerous witnesses testified in support of G29K's plan, including amici Citizen's Association of

Georgetown and Friends of Georgetown Waterfront Park. DCPL, the sole party in opposition to the plan, presented a number of witnesses. Several District residents also testified, some in favor of and some against the project. The Advisory Neighborhood Commission supported the project. *See generally* 10-C DCMR § 3201.2 (requiring Mayor's Agent to accord great weight to Advisory Neighborhood Commission recommendations).

The Mayor's Agent issued a decision and order approving the proposed demolition and finding good cause to modify the historic-preservation covenants.

## II. Analysis

Our review of a decision of the Mayor's Agent is "limited and narrow." *Embassy Real Estate Holdings, LLC v. District of Columbia Mayor's Agent for Historic Pres.*, 944 A.2d 1036, 1050 (D.C. 2008) (internal quotation marks omitted). "We must uphold the Mayor's Agent's decision if the findings of fact are supported by substantial evidence in the record considered as a whole and the conclusions of law flow rationally from these findings." *Kalorama Heights Ltd. P'ship v. District of Columbia Dep't of Consumer & Regulatory Affairs*, 655 A.2d 865, 868 (D.C. 1995). When the Mayor's Agent's "decision is based on an interpretation of the

statute and regulations [the Mayor's Agent] administers, that interpretation will be sustained unless shown to be unreasonable or in contravention of the language or legislative history of the statute." *Id.* (internal quotation marks omitted).

## A. Demolition Permit

DCPL first challenges the Mayor's Agent's decision to issue a demolition permit. We uphold that decision.

Under the Preservation Act, the Mayor's Agent may approve the demolition of a historic landmark if the demolition is "necessary in the public interest." D.C. Code § 6-1104 (a), (e). Demolition is "[n]ecessary in the public interest" if it is "necessary to allow the construction of a project of special merit." D.C. Code § 6-1102 (10). A project has special merit if it provides "significant benefits to the District of Columbia or to the community by virtue of exemplary architecture, specific features of land planning, or social or other benefits having a high priority for community services." D.C. Code § 6-1102 (11). To establish the necessity of demolition, an applicant must show that "all reasonable alternatives were considered." *Citizen's Comm. to Save Historic Rhodes Tavern v. District of Columbia Dep't of Hous. & Cmty. Dev.*, 432 A.2d 710, 718 (D.C. 1981). If the

Mayor's Agent finds that demolition is necessary to a project having special merit, the Mayor's Agent must then balance that special merit against the harm to historic-preservation values that would result from the demolition. *Rhodes Tavern*, 432 A.2d at 715-16.

### 1. Special Merit

DCPL challenges the Mayor's Agent's finding that the project had special merit. "[A] proposed amenity [must] meet a high standard in order to qualify as a 'special merit' project, the construction of which would warrant demolition of a building of historical significance." *Comm. of 100 on the Fed. City v. District of Columbia Dep't of Consumer & Regulatory Affairs*, 571 A.2d 195, 200 (D.C. 1990). "[A] project's special merit [can] rest in whole or in part on a combination of features that in isolation would not necessarily rise to the level of special merit." *Friends of McMillan Park v. District of Columbia Zoning Comm'n*, 149 A.3d 1027, 1039 (D.C. 2016) ("*FOMP I*").

The Mayor's Agent found that the project provided the following special-merit benefits: (1) "[t]he conversion of the polluted and inaccessible coal yard into a well-designed public park, provided to and maintained for the residents of the

District at no cost," and connecting Rock Creek Park, the C&O Towpath, and the Georgetown Waterfront Park; (2) financial support for restoration of the C&O Canal Trail; (3) financial and project-management support for restoration of the nearby Mt. Zion Historic Cemetery; (4) monetary contributions of at least $2.8 million to entities supporting affordable housing in the District, including primarily the D.C. Housing Production Trust Fund; (5) an interpretive on-site exhibit concerning the industrial history of Georgetown; and (6) documentation of the history of the Plant, to be donated to the D.C. Public Library.

DCPL does not appear to dispute, and we therefore take as a given, that the project has at least some special merit, due to the land-planning benefits associated with the public park and the restoration of the C&O Canal trail. DCPL does, however, challenge several other aspects of the Mayor's Agent's analysis.

### i. Off-Site Benefits

DCPL argues that the proposed donations to support affordable housing and the Mt. Zion Historic Cemetery are "off-site" benefits that cannot properly be considered special-merit benefits. We disagree. As previously noted, to qualify as necessary in the public interest, a project must be "of special merit." D.C. Code § 6-

1102(10). The Preservation Act defines "special merit" to include "social or other benefits having a high priority for community services." D.C. Code § 6-1102(11). Those provisions do not appear to require a physical nexus between the site of the demolition and the "location" of all of a project's special-merit benefits (even if we were to assume that it would be generally feasible to determine the "location" of special-merit benefits). Nor does our case law support such a requirement. To the contrary, we have approved consideration of special-merit benefits that do not seem to be tied tightly to the physical site of the demolition. *See, e.g.*, *Friends of McMillan Park v. District of Columbia Zoning Comm'n*, 207 A.3d 1155, 1173-74 (D.C. 2019) ("*FOMP II*") (exceptional economic benefits can contribute to project's special merit); *Rhodes Tavern*, 432 A.2d at 717 n.13 (same); *compare Kalorama Heights*, 655 A.2d at 874 (general economic benefits to District and specific benefits to residents of project do not by themselves suffice to constitute special merit).

DCPL argues that two previous decisions of the Mayor's Agent preclude consideration of "off-site" benefits: *Archdiocese of Washington*, HPA Nos. 99-219, etc. (Nov. 9, 1999), and *King's Palace*, HPA Nos. 88-825 and 88-826 (Mar. 1, 1989). DCPL apparently did not bring those decisions to the attention of the Mayor's Agent in this case, and the Mayor's Agent's decision does not address them. Under the circumstances, we doubt that a claim of inconsistent agency decision-making is

properly before this court. *See, e.g.*, *Stackhouse v. District of Columbia Dep't of Emp't Servs.*, 111 A.3d 636, 639 (D.C. 2015) ("[I]n the absence of exceptional circumstances, we will not entertain a claim that was not raised before the agency.") (internal quotation marks omitted); *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004) (Roberts, J.) (where party makes significant showing that analogous cases have been decided differently, agency must address argument); *Walker v. Gen. Servs. Admin.*, Nos. 99-3310 etc., 2000 WL 991919, at *3 (Fed. Cir. July 19, 2000) (per curiam) (declining to consider claim of inconsistent agency decision-making that was not raised before agency). In any event, neither decision supports reversal of the Mayor's Agent in this case.

In *Archdiocese of Washington*, one of the claimed special-merit benefits was provision of relocation assistance to a tenant who would be displaced by the proposed demolition. *Archdiocese of Washington*, HPA No. 99-219, at 10. Without explanation, the Mayor's Agent described that assistance as an "off-site amenity that is irrelevant for purposes of establishing, under the [Preservation] Act, whether the project's on-site amenities qualify the project for special merit status." *Id.* A second claimed special-merit benefit was that the project would provide resources to assist Catholic Charities in performing services to the community. *Id.* at 17. After pointing out that many of those services would be performed at locations other than the

project site, the Mayor's Agent said, again without explanation, that such an off-site amenity was "not within the provisions or anticipations of the [Preservation] Act." *Id.* To the extent that *Archdiocese of Washington* might be read to reflect the categorical view that only "on-site" benefits can contribute to a special-merit finding, the basis for that view was not explained in *Archdiocese of Washington*. Moreover, for the reasons we have already stated, such a categorical rule finds no support in the pertinent statutory language and is contrary to prior decisions of this court.

*King's Palace*, HPA Nos. 88-825 and 88-826 (Mar. 1, 1989), provides even less support to DCPL. In that case, the Mayor's Agent commented that moving certain amenities onto the project site enhanced the project's land-planning features (thereby reinforcing the project's special merit), but the Mayor's Agent did not state that such a move would be required in order for the amenities to contribute to the project's special merit. *King's Palace*, HPA Nos. 88-825 and 88-826, at 15.

To be clear, we hold only that the fact that a claimed benefit can be viewed as in some sense being "located" somewhere other than the physical location of a project does not preclude the claimed benefit from contributing to the project's special merit. Several of the most important claimed benefits in this case -- such as

the park that would connect the Georgetown Waterfront Park with the C&O Canal and Rock Creek Park, and the restoration of nearby Mt. Zion Historic Cemetery -- are tied quite closely to the physical location of the project. We need not consider, and therefore express no view about, cases in which most or all of the claimed special-merit benefits have no significant physical connection to the location of the project at issue.

### ii. Generalized Benefits

DCPL argues that the proposed monetary donations to support affordable housing and the restoration of the Mt. Zion Historic Cemetery are generalized benefits that cannot be treated as contributing to the project's special merit. We conclude to the contrary. "The social benefits to be included in a special merit project must have a high priority for community services. Thus, factors which are common to all projects are not considered as special merits." *Comm. of 100*, 571 A.2d at 200 (brackets, citation, and internal quotation marks omitted).

DCPL relies upon our decision in *Kalorama Heights*, where we affirmed a decision by the Mayor's Agent concluding that the benefits in a proposal were "not special enough" to qualify as "social or other benefits having a high priority for

community services." 655 A.2d at 874 (internal quotation marks omitted). We explained that projects that predominantly benefit occupants of the proposed new buildings, "coupled with general benefits to the District (such as increased tax revenues or increased housing stock)," are insufficient to constitute special-merit benefits. *Id.* In the present case, however, G29K's proposal outlines specific beneficiaries for targeted donations rather than providing only generalized benefits. It was not unreasonable for the Mayor's Agent to determine that the donations addressed issues having a "high priority for community services." *Cf., e.g.*, *FOMP II*, 207 A.3d at 1171-72 (affirming as reasonable Mayor's Agent's finding that, where applicants were not required to include any affordable housing in their proposal, "the inclusion of housing, twenty percent of which will go to low-income residents" can contribute to proposal's special merit); *see generally Embassy Real Estate Holdings*, 944 A.2d at 1050 (court defers to Mayor's Agent's expertise on question whether project has "special merit").

In sum, we uphold the Mayor's Agent's determination that the project was one of special merit.

## 2. Necessity

DCPL also challenges the Mayor's Agent's determination that demolition of the Plant was necessary to achieve the claimed-special merit benefits. We affirm the determination of the Mayor's Agent.

An applicant seeking approval to demolish a historic landmark bears the burden of showing that demolition is "necessary in the public interest." D.C. Code §§ 6-1102(10), -1104(e)-(f); *see also, e.g.*, *Kalorama Heights*, 655 A.2d at 869 ("The applicant has the burden of proving entitlement to a demolition permit. In meeting this burden, the applicant must show that it considered alternatives to the total demolition of the historic building and that these alternatives were not reasonable.") (citation omitted). "If a reasonable alternative would achieve the same special-merit benefits . . . while avoiding or reducing the need for demolition . . . , thereby reducing the adverse impact on historic-preservation interests, then the Mayor's Agent cannot properly conclude that the proposed demolition . . . is necessary to allow the construction of a project of special merit." *FOMP I*, 149 A.3d at 1043 (internal quotation marks omitted).

### i. Necessity and Demolition

DCPL raises two arguments that turn on the relationship of the terms "necessary" and "demolition." We are not persuaded by either argument.

First, DCPL argues that certain of the claimed special-merit benefits -- such as the park and the interpretive exhibits -- could physically have been provided without any demolition of the Plant. That is true. The inquiry into necessity, however, is not limited to physical necessity, and includes considerations such as financial feasibility. *See, e.g.*, *Don't Tear It Down, Inc. v. District of Columbia Dep't of Hous. & Cmty. Dev.*, 428 A.2d 369, 380 (D.C. 1981) ("Reasonableness must be imputed into the 'necessary' standard, and at hearing on each 'special merit' permit, factors including but not limited to cost, delay, and technical feasibility become proper considerations for determining 'necessary.'").

Second, DCPL argues that "demolition" was not shown to be necessary, because the structure could have been substantially restored, after initial demolition, using "in-kind" materials. The Mayor's Agent rejected this argument, reasoning that although an applicant "could reduce the preservation losses by rebuilding in-kind post-demolition," the applicant is not required to do so under the Preservation Act,

provided that the balancing of net preservation loss and special merit favors the applicant.

The Mayor's Agent's analysis on this point logically rests on the premise that tearing a structure down constitutes demolition, even if the building is then reconstructed using "in-kind" materials. In other words, the possibility of reconstruction does not affect the question of whether demolition is necessary, but instead is relevant only to the balancing of historic-preservation loss and special-merit benefit. We conclude that the Mayor's Agent's decision reflects a reasonable interpretation of the Preservation Act.

The Preservation Act defines "demolition" as "the razing or destruction, entirely or in significant part, of a building or structure," including "the removal or destruction of any facade of a building or structure." D.C. Code § 6-1102(3). In our view, the Mayor's Agent could reasonably treat the act of tearing a building down and then rebuilding it, even with in-kind materials, as demolition within the meaning of the Act. *See generally, e.g.*, *Gondelman v. District of Columbia Dep't of Consumer & Regulatory Affairs*, 789 A.2d 1238, 1244 (D.C. 2002) ("Although, as an original matter, we might or might not agree with the Mayor's Agent's

interpretation of the Act, we cannot say that [the] interpretation is unreasonable [or] inconsistent with the language of the Act.").

## ii. Reasonable Alternatives

Although DCPL acknowledges that some demolition of the existing structure would be necessary for residential use, DCPL argues that G29K inadequately considered alternatives involving less extensive demolition. To the contrary, substantial evidence supports the conclusion that G29K adequately considered reasonable alternatives. There was evidence that G29K considered multiple alternative designs but determined that, without extensive demolition, it would not be possible to repair the structural damage and remove the hazardous materials so as to secure insurance for the project and make the project financially viable. Although an analysis considering only public safety concluded that moderate demolition would suffice, there was evidence that such a project would be unable to secure insurance or financing and would therefore generate economic losses of up to $100 million. And although DCPL points to an earlier design proposed at one point by G29K, DCPL's witness at the hearing did not dispute that the earlier design would have required a "virtually identical" degree of demolition.

DCPL contends that various pieces of evidence tend to show that there were other reasonable alternatives that G29K did not adequately explore. The existence of some evidence tending to support DCPL's position, however, does not mean that the Mayor's Agent's contrary conclusion was unsupported by substantial evidence. *See, e.g.*, *Potomac Elec. Power Co. v. District of Columbia Dep't of Emp't Servs.*, 77 A.3d 351, 354 (D.C. 2013) ("Where there is substantial evidence to support [an agency's] findings[,] . . . the mere existence of substantial evidence contrary to that finding does not allow this court to substitute its judgment for that of [the agency].") (brackets and internal quotation marks omitted).

Relatedly, DCPL challenges the adequacy of the Mayor's Agent's findings on the issue of reasonable alternatives. We conclude that Mayor's Agent adequately explained his decision. The Mayor's Agent expressly found that the proposed demolition was necessary to construct the project of special merit, and the Mayor's Agent went on to explain the basis for that finding in some detail. Specifically, the Mayor's Agent noted that the current structure was unsafe and permeated with toxic chemicals, that a new residential building was essential to the economic viability of the project, and that changes would have to be made to the current structure to permit the construction of a residential building.

In sum, the record supports the conclusion that G29K adequately considered reasonable alternatives to demolition. *See, e.g.*, *FOMP II*, 207 A.3d at 1177 (affirming Mayor's Agent's findings where "the applicants' witnesses at the hearing provided ample indication that they had considered numerous alternatives and that no other design could provide the same level of benefits with less demolition").

### iii. Commission of Fine Arts Recommendation

Finally, DCPL argues that the Mayor's Agent's finding of necessity erroneously relied on the recommendation of the Commission of Fine Arts, rather than that of the HPRB. The Mayor's Agent, however, did not rely on the Commission's recommendation in making the necessity finding, instead giving weight to the Commission's recommendation only when discussing the distinct question whether there was good cause to modify the historic-preservation covenant in the deed.

### 3. Balancing of Special-Merit Benefits and Historic-Preservation Loss

We further hold that the Mayor's Agent reasonably concluded that the project's special-merit benefits outweighed the net loss to historic preservation

caused by the demolition. The Preservation Act "implicitly requires that, in the case of demolition, the Mayor's Agent balance the historical value of the particular landmark against the special merit of the proposed project." *Rhodes Tavern*, 432 A.2d at 716. The Act does not, however, require the Mayor's Agent to find that those benefits outweigh the net preservation loss to the greatest extent possible. As the Mayor's Agent noted, G29K presented largely uncontested evidence indicating that the Plant is "dangerous, toxic, and inaccessible" and must be substantially demolished for any adaptive reuse. The Mayor's Agent explained that although the Plant has some historic value as an architectural building, overwhelming evidence supported the conclusion that the value of the project outweighed the loss of the Plant's historic elements. The Mayor's Agent also credited testimony indicating that the transformation of the site would be an important step toward revitalizing the historic C&O Canal Park, thereby reducing the net historic-preservation loss. We conclude that there was substantial evidence in the record to support these findings.

In sum, we see no reason to disturb the conclusions of the Mayor's Agent regarding the Preservation Act. The record reveals that the Mayor's Agent made reasonable findings of fact on each required issue, that substantial evidence in the record supported those findings, and that the Mayor's Agent's conclusions flowed rationally from those findings of fact.

## B. Historic-Preservation Covenants

DCPL also challenges the Mayor's Agent's determination that there was good cause to modify the historic-preservation covenants. We see no basis for reversal.

In analyzing whether to modify the covenants, the Mayor's Agent examined the text and purpose of both the covenants and the Secretary of the Interior's Standards for the Treatment of Historic Properties. After explaining that there is no binding precedent for what constitutes "good cause" to modify such covenants, the Mayor's Agent concluded that, given the District's "sophisticated historic preservation law, . . . committed preservation community, and fair public process for addressing preservation disputes," the finding that a project is one of special merit within the meaning of the Preservation Act was a reasonable basis to modify the covenants. In any event, the Mayor's Agent explained, G29K had done "much more than" simply establish that its project had special merit, because it offered a "stunning design by a world acclaimed architect" that "may achieve aesthetic and cultural significance exceeding that of the existing [Plant]." Accordingly, the Mayor's Agent found that there was good cause to modify the covenants "to the extent necessary to allow the proposed demolition and construction."

Although DCPL argues that the Mayor's Agent's analysis was too conclusory, we conclude that the Mayor's Agent's analysis was amply explained. *See generally, e.g.*, *Friends of McMillan Park v. District of Columbia Zoning Comm'n*, 211 A.3d 139, 149 (D.C. 2019) ("*FOMP III*") ("If a reviewing court is satisfied that the agency has provided a reasoned analysis, so that the agency's path may reasonably be discerned, the court will affirm the agency's decision.") (ellipsis and internal quotation marks omitted).

Nor are we persuaded, as DCPL argues, that the Mayor's Agent acted arbitrarily and capriciously in finding good cause to modify the covenants. As we stated in *Ammerman v. District of Columbia Rental Accommodations Comm'n*, 375 A.2d 1060 (D.C. 1977):

> "Good cause" depends upon the circumstances of the individual case, and a finding of its existence (or nonexistence) lies largely in the discretion of the officer or court to which the decision is committed. By its very nature, "good cause" requires the evaluation of a number of subtle factors, a task properly given to the administrative agency most experienced in dealing with such factors in the first instance. In the absence of an abuse of the agency's discretion in that evaluation, we are bound by that good cause or lack of good cause determination.

*Id.* at 1063 (citations and internal quotation marks omitted). We view the Mayor's Agent's good-cause determination to be entirely reasonable, and we are not persuaded by DCPL's arguments to the contrary.

First, DCPL appears to argue that a finding of good cause to modify the covenants must be based on an interpretation of the standards of historical preservation reflected in the covenants. That argument is somewhat difficult to follow, but the Mayor's Agent's order did explain what the covenants would have required, why the project could not reasonably meet those requirements, and why there was good cause to modify the requirements. That explanation reflected adequate consideration of what the covenants' standards would have required in the absence of modification.

Second, DCPL argues that permitting modification of the covenants would "run contrary to the entire purpose of historic preservation law." As the Mayor's Agent explained, however, approving the project at issue in this case was consistent with the Preservation Act, which allows construction of projects of special merit even if some historic-preservation loss occurs.

Finally, DCPL argues that the Mayor's Agent gave undue weight to the recommendation of the Commission of Fine Arts and to the aesthetic characteristics of the project. We do not agree. Both considerations are indisputably relevant, and we see no indication that the Mayor's Agent gave either undue weight in finding good cause.

**C.**

Amicus curiae Committee of 100 on the Federal City raises several issues that DCPL did not raise in its opening brief, including most notably the argument that the SHPO unlawfully delegated to the Mayor's Agent the decision whether to modify the covenants. This court does not ordinarily consider issues raised by an amicus curiae but not properly raised by a party. *See, e.g.*, *Apartment & Office Bldg. Ass'n of Metro. Wasington v. Pub. Serv. Comm'n*, 203 A.3d 772, 784 (D.C. 2019) ("An amicus curiae must take the case as he finds it, with the issues made by the principal parties.") (brackets and internal quotation marks omitted); *Nixon v. United States*, 736 A.2d 1031, 1032 (D.C. 1999) (per curiam order denying rehearing) ("[I]n the absence of exceptional circumstances, we will not consider questions raised by an *amicus* but not addressed by the parties."). DCPL did attempt to adopt at least some of those arguments in its reply brief, but we ordinarily do not consider

arguments that are first raised in a reply brief, *e.g.*, *Massey v. Massey*, 210 A.3d 148, 154 n.12 (D.C. 2019). In the circumstances of this case, we decline to address these issues. Specifically, the issues were raised at best in passing before the Mayor's Agent; the Mayor's Agent's decision and order did not address the issues; as noted, DCPL did not raise the issues in its opening brief; G29K and the Mayor's Agent therefore did not fully brief the issues; and at least some of the issues appear to be less than straightforward.

For the foregoing reasons, the Mayor's Agent's order and decision are

*Affirmed.*